# Commonwealth *vs.* Justin DeMatos.

No. 08-P-204.

Bristol. July 22, 2010. - September 17, 2010.

Present: Duffly, Dreben, & Kafker, JJ.

*Constitutional Law,* Confrontation of witnesses, Harmless error, Assistance of counsel. *Practice, Criminal,* Confrontation of witnesses, Harmless error, Assistance of counsel, Disclosure of identity of informer. *Evidence,* Certificate of drug analysis. *Controlled Substances. Error, Harmless. Identification.*

At the trial of indictments charging, inter alia, trafficking in cocaine, the admission in evidence of certificates of drug analysis without the testimony of the analyst who conducted the tests, in violation of the defendant's right of confrontation, was harmless beyond a reasonable doubt, where the other evidence at trial, including drug paraphernalia and a large amount of cash found in the defendant's apartment, the defendant's flight, and the defendant's own admissions, was so powerful that the admission of the certificates had little or no effect in proving either the composition or weight of the substances in question. [730-733]

A trial court judge hearing a criminal defendant's motion for a new trial did not err in declining to hold a hearing regarding the defendant's allegations that an affidavit in support of a search warrant for his apartment contained false statements, where the judge, who ordered additional discovery, examined the documents provided by the Commonwealth, and required an additional affidavit swearing to the authenticity of the documents, acted within his discretion in accepting the documents as authenticated and, based on that material and an assessment of the affiant's credibility during trial, in determining that there were no misrepresentations sufficient to cast a reasonable doubt on the veracity of the challenged statements and that a further hearing was not necessary. [733-739]

INDICTMENTS found and returned in the Superior Court Department on June 9, 2003.

The cases were tried before *Robert J. Kane,* J., and a motion for a new trial was heard by him.

*Joseph M. Kenneally* for the defendant.

*Steven E. Gagne,* Assistant District Attorney, for the Commonwealth.

DREBEN, J. Charged with trafficking in cocaine in an amount exceeding twenty-eight grams and trafficking within 1,000 feet of a school, the defendant, Justin DeMatos, was convicted of the lesser included offense of trafficking in cocaine in an amount of fourteen grams or more but less than twenty-eight grams, G. L. c. 94C, § 32E(*b*)(1), and was also convicted of the school zone violation. In his direct appeal, the defendant claims that he was deprived of his constitutional right of confrontation by the admission, over his objection, of certificates of drug analysis of the substances involved. His case was tried after the decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005), and before the decision in *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009).

Postconviction, he claimed his counsel was ineffective in not seeking a *Franks-Amral*[1] hearing, and he sought such a hearing in support of his motion for a new trial. The motion was denied. That denial was consolidated with his direct appeal. We affirm his convictions and the denial of his motion for a new trial.

1. *Evidence at trial.* Viewed in the light most favorable to the Commonwealth, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), the evidence at trial was as follows: On March 26, 2003, armed with a search warrant,[2] Fall River police officers announced their presence and, after receiving no response, forced their way into the defendant's first-floor apartment at 162 McCloskey Street. Inside were three men and a pit bull terrier. Upon seeing the police, the defendant fled, carrying a pink box; some of its contents fell along the path of his flight. Among items subsequently retrieved were several vials of steroids, hypodermic needles, and a key. Police later used the key to open a safe in the defendant's apartment.

When the defendant was apprehended shortly after the chase, the pink box was next to him and contained $8,000 wrapped in a rubber band. Two golf-ball-sized plastic bags containing white

---

[1]*Franks* v. *Delaware*, 438 U.S. 154 (1978). *Commonwealth* v. *Amral*, 407 Mass. 511 (1990).

[2]The police obtained two search warrants, one for the defendant's apartment and one for his business. The two affidavits in support of the applications were almost identical except for the address. Nothing of significance was found at the business address. One of two controlled buys referenced in the warrant affidavits took place near the defendant's place of business.

powder believed to be cocaine were near the box. The police handcuffed the defendant and brought him to his apartment where he waived his Miranda rights.[3] When questioned, he told police that he did not have any money or contraband other than what was in the pink box. Police, however, found in his apartment an additional bag of white powder, $2,679, a spoon with a powder residue, baggies, and three rolled-up dollar bills.[4] Near the rear entrance through which the defendant had fled, police retrieved a small digital scale. The money, the three bags of white powder, the rolled-up dollar bills, the scale, the baggies, and the spoon with the residue were among the exhibits at trial and were sent to the jury.[5]

After having been shown the bag of white powder found in the apartment, the defendant said, "Oh I forgot about that cocaine. Besides, that's just personal use." When asked what he was doing with two and one-half ounces of cocaine,[6] he told the officer that he smokes cocaine all the time, and that three ounces were "no big deal to him." According to the officer, the defendant pointed out that the police only found one-half of an ounce in his house and also stated that he was smoking cocaine when the police initially knocked on the door. The police officer in charge of the investigation (Paul Gauvin) indicated on cross-examination that he believed the defendant "was a little high" when apprehended.

Certificates of drug analysis were admitted in evidence showing that each of the three bags as well as the residue on the spoon were cocaine. According to the certificates, one of the two bags found with the defendant after his chase contained 27.79 grams of cocaine, the other bag contained 27.91 grams, and the bag found in the apartment contained 14.86 grams of cocaine (a total of 70.76 grams).

After a voir dire, a police officer with extensive experience in narcotics investigations testified that fourteen grams is one-half

---

[3]See *Miranda* v. *Arizona*, 384 U.S. 436 (1966).

[4]There was testimony that rolled-up dollar bills are used to snort cocaine.

[5]The jury were not informed of other items found, e.g., other narcotic pills and brass knuckles.

[6]The record does not explain how the officer knew the weight of the cocaine at the time the defendant was questioned. We note the police had found a scale.

of one ounce and that twenty-eight grams is one ounce, that one ounce of cocaine would sell for between eight and twelve hundred dollars, and that one-half of one ounce would sell for between four to six hundred dollars. When asked whether the possession by a person of sixty-eight to seventy grams of cocaine was consistent with personal use or with distribution, his answer was distribution, and when asked whether that amount of cocaine and $10,000 in cash was consistent with personal use or with distribution, he stated it would be consistent with distribution.

2. *Melendez-Diaz issue.* The United States Supreme Court's decision in *Melendez-Diaz* requires us to hold that the admission of the drug certificates was constitutional error. The certificates were within the "core class of testimonial statements" that trigger confrontation clause protections. *Melendez-Diaz, supra* at 2532, quoting from *Crawford* v. *Washington,* 541 U.S. 36, 51 (2004). Here, the defendant objected to their admission, and, in any event, in cases tried after the decision in *Commonwealth* v. *Verde,* 444 Mass. 279 (2005), and before *Melendez-Diaz,* the standard of review is whether the admission of the drug certificates at trial was harmless beyond a reasonable doubt. *Commonwealth* v. *Vasquez,* 456 Mass. 350, 352 (2010). The standard is strict, and the question is whether

> "we can be satisfied, beyond a reasonable doubt, that the erroneously admitted certificates of analysis had little or no effect on the verdicts. . . . It is not enough for the Commonwealth to demonstrate that its other, properly admitted evidence was 'sufficient' to convict the defendant . . . . Rather, to establish harmlessness beyond a reasonable doubt, the Commonwealth must show that other properly admitted evidence of guilt is 'overwhelming.' "

*Id.* at 362, quoting from *Commonwealth* v. *Tyree,* 455 Mass. 676, 701, 704 n.44 (2010).

The Supreme Judicial Court has identified a number of factors that may be looked at,[7] see *Vasquez, supra* at 360 n.12, but has stated "there is no uniform standard for all cases." *Ibid.*

---

[7]Factors that the *Vasquez* court stated may be considered include "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial;

"Proof that a substance is a particular drug 'may be made by circumstantial evidence.' " *Commonwealth* v. *Charles*, 456 Mass. 378, 381-382 (2010), quoting from *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987). In *Dawson*, one of two questions reported was:

> "Whether a substance can be identified as a controlled drug as defined by G. L. c. 94C, § 31 through the testimony of experienced police officers or the users of the drug rather than through laboratory analysis or testimony by a qualified chemist?"

*Id.* at 466-467. The court answered the question in the affirmative adding:

> "The trial judge will first have to make a finding that any police or drug-user witness's experience with a drug would or would not permit him to give an opinion as to what drug a particular substance was. If the judge finds the witness qualified, the knowledge and competence of that witness, and his lack of training in chemical analysis, will bear on the weight to be given to his testimony. We suspect it would be a rare case in which a witness's statement that a particular substance looked like a controlled substance would alone be sufficient to support a conviction."

*Id.* at 467. See *Vasquez, supra* at 365. The court in *Dawson* also noted that "[t]he great weight of authority in this country permits, for example, an experienced user of a controlled substance to testify that a substance that he saw and used was a particular drug." *Dawson, supra.*

In this case, the defendant was a user of drugs. Indeed, he admitted to the police that he was using cocaine at the time of their initial entry — a statement buttressed by the police officer's testimony that the defendant was a little high when apprehended. The defendant stated that he smoked all the time, that he had forgotten "about that cocaine" in the apartment, that

the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; . . . and the weight or quantum of evidence of guilt." *Id.* at 360 n.12, quoting from *Commonwealth* v. *Tyree, supra* at 701.

the cocaine was for his personal use, and that three ounces was not a big deal.

In these circumstances, where the defendant admitted to being a substantial user of cocaine, stated that he was using cocaine in his apartment at the time the police arrived, and when shown the drugs found in the apartment, acknowledged that he had forgotten that cocaine was there, we consider the evidence that the composition of the drugs in the apartment was cocaine was so powerful that the certificates had little or no effect on the verdicts. See *Commonwealth* v. *Harris*, 75 Mass. App. Ct. 696, 707 & n.10 (2009) (error harmless beyond a reasonable doubt where, among other evidence, defendant had signed statement admitting substance was cocaine). Equally strong, particularly in view of the defendant's statement that "three ounces was no big deal," is the inference that the bags of white powder found near him after he was apprehended was the same substance.

The overwhelming evidence of narcotics, including the large sum of money, the scale, the baggies, the spoon with a powder residue, and the defendant's flight, together with the defendant's admission that he was using cocaine when the police entered, and his implicit, if not explicit, admission that the drugs were cocaine lead us to conclude that the admission of the drug certificates had little or no effect in proving the substances found were cocaine.[8]

The evidence of the certificates as to the amount of cocaine, although a more difficult question, was also, in our view, harmless beyond a reasonable doubt. The defendant was convicted of the lesser included offense of trafficking in fourteen or more grams of cocaine. When asked what he was doing with two and one-half ounces of cocaine, the defendant did not deny the amount, but rather stated that because he smoked all the time, three ounces was no big deal. He took pains to point out that only one-half of an ounce (fourteen grams) was found in his apartment. That he knew the actual weight of the cocaine can be inferred from the scale in his apartment. The one-half of an ounce bag as well as the two golf-ball-sized bags were admitted

---

[8]We note that the prosecutor did not refer to the certificates during his closing argument. Contrast *Commonwealth* v. *Tyree, supra* at 702; *Commonwealth* v. *Ware*, 76 Mass. App. Ct. 53, 57-58 (2009); *Commonwealth* v. *Perez*, 76 Mass. App. Ct. 439, 444 (2010).

in evidence and sent to the jury. The jurors could determine that the weight of the cocaine in the three bags exceeded fourteen grams (half an ounce).[9] See *Commonwealth* v. *Connolly*, 454 Mass. 808, 831 (2009). While there was testimony that seventy grams was more indicative of distribution than of personal use, the jury rejected the weight of seventy grams stated in the certificates. The other evidence of distribution, including the large amount of cash, the scale, and the baggies was such that we consider the error in admitting the certificates as to weight had little or no effect on the verdict and hence was harmless beyond a reasonable doubt.

3. *Motion for new trial.* Subsequent to his convictions, the defendant brought a motion for a new trial (which was heard by the trial judge) on the ground that his counsel had been ineffective in failing to seek a hearing pursuant to *Franks* v. *Delaware*, 438 U.S. 154 (1978). In support of his motion, he sought discovery and also a *Franks* hearing. He claims that the two controlled buys, which were essential to the validity of the warrant affidavit, never occurred.[10] Under *Franks*,

"where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."

*Id.* at 155-156. If perjury or reckless disregard is established by a preponderance of the evidence and the remaining content of the affidavit is insufficient to provide probable cause, the search warrant must be voided, and the evidence seized excluded. *Id.* at 156.

In *Commonwealth* v. *Amral*, 407 Mass. 511, 522, 525 (1990), the Supreme Judicial Court held that a defendant, under a less stringent test than *Franks*, may be entitled to an in camera hearing to determine whether he or she must receive a *Franks* hearing. *Amral*, *supra* at 525. The court held "that the public

---

[9]Moreover, the digital scale was in evidence and sent to the jury room.

[10]We agree that the controlled buys were essential to the warrants' validity.

interest in deterring police misconduct requires the trial judge to exercise his or her discretion to order an in camera hearing where the defendant by affidavit asserts facts which cast a reasonable doubt on the veracity of material representations made by the affiant concerning a confidential informant." *Id.* at 522.[11] See generally Smith, Criminal Practice and Procedure §§ 4.36 - 4.40, 4.42 (3d ed. 2007); Grasso & McEvoy, Suppression Matters Under Massachusetts Law §§ 10-6[a]-[e] (2010-2011).

Here, the motion judge was satisfied that further inquiry was required. The question before us is whether his inquiry went far enough. We hold that it did, that an additional hearing was not necessary, and that the judge's denial of a new trial was within his discretion.

We take the facts relevant to the new trial motion from the record and the judge's careful memorandum. The defendant, in conjunction with his motion for a new trial, moved for extensive discovery concerning the controlled buys, pursuant to Mass. R.Crim.P. 30 (c)(4), 435 Mass. 1501 (2001), including: the date and times of the alleged controlled buys; identity of the confidential informant; amount of narcotics alleged to have been purchased; amount of money alleged to have been paid in the two controlled buys; serial numbers of the money alleged to have been used in the controlled buys; and results of chemical analyses conducted on the drugs alleged to have been purchased in the two controlled buys.

The defendant filed a supporting affidavit, not included in the record, which, the judge stated, averred: that the material contained in Officer Paul Gauvin's warrant affidavit setting forth the two controlled buys was false; that the defendant never sold drugs to anyone; and that, despite explicit requests, the Commonwealth never turned over to the defense the analyses from the alleged controlled drug buys, Gauvin's request for funds for the two buys or the reports, logs, or memoranda regarding the two alleged controlled buys.

---

[11]The court continued, "Mere suspicion that there was no informant, or that the informant's 'reliability' credentials have been misstated, or that his information was other than as recited by the affiant, is not enough to trigger an in camera hearing, but an assertion of facts tending to confirm such a suspicion is sufficient." *Amral, supra* at 522.

The judge noted appellate counsel's claim that the only information relevant to the controlled buys given to the defendant was a single document. The record shows that that document, entitled "Fall River Police Department Evidence/Property Custody Document," was dated March 28, 2003, two days after the warrants were executed and was redacted in two places. The document states that, as a result of the controlled buys, an unspecified amount of cocaine and "O.C." pills were received by Gauvin. It named Justin DeMatos (the defendant) as the person from whom the drugs were received and stated they were found at the defendant's address.

After recounting the pretrial proceedings and emphasizing the defendant's repeated requests for discovery, the judge summarized:

> "DeMatos, by affidavit, denied that any drug sale took place. During 2005 and 2006, the Fall River Police Department failed to supply any information or documentation of the use of buy monies allegedly used in the controlled buys. Despite being directly ordered by the court [a different motion judge not the trial and current motion judge] to disclose such information, if available, the Fall River Police Department failed to provide any information tracing the existence of an account for buy monies, the use by Gauvin of buy monies, or the transfer of buy monies to the informant for use in the controlled buys. The question, therefore, arises whether trial counsel, faced with discrepancies in the handling of drugs pursuant to G. L. c. 94C, § 47A,[12] together with a curious absence of records accounting for the buy monies involved in the controlled buys, should have, as a matter of effective representation, moved for a *Franks* or *Amral* hearing."

---

[12]General Laws, c. 94C, § 47A, as amended by St. 1983, c. 184, § 1, provides in part:

> "The department shall keep a record of the place where such controlled substances or narcotic drugs were seized, of the kinds and quantities of drugs received, by whose order the controlled substance or narcotic drugs were received, by whom the controlled substance or narcotic drugs were delivered and received, the date and manner of destruction or disposition of such controlled substances or narcotic drugs, and a report under oath of such destruction or disposition shall be made to the court, which record shall be open to inspection by attorneys of record in the case and by all federal and state officers charged with enforcement of federal and state narcotic laws."

The judge did not directly answer the question in his memo-
randum, but pointed out that the Commonwealth's failure to
provide documentation of the use of buy monies "does not
derive from the Commonwealth's assertion of a privilege based
on protecting the informant's identity."[13] He stated that the
absence of documentation on the use of monies in the two
controlled buys leads to the reasonable inference that no public
moneys were transferred to the informant. The judge concluded
that the defendant's affidavit, together with this inference and
the discrepancies in following the requirements of G. L. 94C,
§ 47A, see note 12, *supra*, "provides enough heft to make it
worthy of further exploration." He then ordered the Com-
monwealth "[t]o supply the court and appellate counsel with all
information regarding the narcotics alleged to have been pur-
chased and the buy monies alleged to have been used in the two
controlled purchases."

In response to the court order, the Commonwealth submitted:

> "1. Memorandum from Sgt. Paul Gauvin, Fall River Police
> (1 page);

> "2. Fall River Police Evidence/Property Custody Docu-
> ment (1 page); and

> "3. Controlled Purchase Buy Money Ledger (redacted, 1
> page)."

Gauvin's memorandum, addressed to an assistant district attor-
ney, stated that he was enclosing "the controlled buy log and
the evidence custody document," and requested that they be
sanitized. He also added that "as discussed during the trial with
[the prosecutor], both the defendant and his brother had some
involvement in threatening and physically assaulting several
people in Fall River, in an effort to uncover the informant."[14]

The Evidence/Property Custody Document was the document

---

[13]The judge noted that the "absence of such an objection" may have been
because the government believed that the defendant knew the identity of the
informant. The warrant affidavit stated that the informant and the defendant
"used to be close friends."

[14]In a motion for reconsideration of the denial of his motion for a new trial,
the defendant appended an affidavit from his trial attorney indicating that
neither the district attorney's office nor the police department ever gave him

provided earlier, the only difference was that the portion that had previously been redacted now showed "1 bag cocaine" and "4 OCS pills."[15] Upon receipt of this material, the judge entered the following order:

> "Sergeant Paul Gauvin shall submit an affidavit addressing the authenticity of the 'buy money ledger' previously submitted to the court and the content of his one page memorandum on controlled buys that was also submitted to the court."

In response, Gauvin filed an affidavit stating that he participated in two controlled buys, that he obtained a certain sum of money for what is termed on the control buy log as "controlled buy 'B' " which covered both buys, that his memorandum attested to his concerns regarding safety, that both the controlled buy log and the Evidence/Property Custody documents are kept in the normal course of business, that he filled out the latter accurately, that the discovery materials submitted constitute the entirety of the information regarding the narcotics alleged to have been purchased and the buy monies, and that at the time the documents were drafted the department did not have a "controlled policy."[16] A controlled buy policy was put in place on April 17, 2003.

Considering that he had "authoriz[ed] discrete discovery and [had] examin[ed] the results of that discovery process," the judge entered an order denying the motion for a new trial. In his view, the defendant had failed to demonstrate that the motion to suppress would have been successful and hence failed to show that counsel was ineffective. See *Commonwealth* v. *Cutts*, 444 Mass. 821, 830 (2005).

The defendant's main focus on appeal is that the judge erred

---

an indication that the defendant was engaging in such action. He also presented a request to the police department seeking records of any such action by the defendant. He received no response.

[15]The third document was an untitled page, without the name of the defendant, and included the headings: "Date," "Detective," "Purpose used," "Amount Used," "Balance," and "Serial#'s." The date given was March 18; the detective listed was P. Gauvin; the purpose was "controlled buy B"; and under serial numbers was written "see copies for serial #."

[16]A policy document attached to the affidavit set forth the policy and gave its effective date as stated in Gauvin's affidavit.

in failing to order a *Franks* hearing because the defendant had made a substantial showing that the Fall River police intentionally fabricated the account of the controlled buys alleged in the warrant affidavits. He lays stress on the following: that no document exists prior to the warrant affidavits suggesting that the defendant was involved in a controlled buy; while the controlled buy ledger which was not produced until after many requests and several court orders predates the affidavit, it makes no mention of the defendant; the copies of the money referenced in the controlled buy ledger do not exist; the drugs from the buy were not turned in to the evidence officer until two days after the execution of the warrant and one week after the buys allegedly took place; the drugs no longer exist; and there is no documentation supporting the claim that the defendant was threatening individuals in an attempt to learn the name of the informant and defendant's trial counsel never heard such a claim.[17]

It is true that the matters listed required further inquiry and, indeed, so the judge determined. However, they did not require a *Franks* hearing or even an *Amral* hearing. In *Commonwealth* v. *Alcantara*, 53 Mass. App. Ct. 591, 595 (2002), where statements of the affiant concerning the informant in the affidavit in support of the warrant appeared to be inconsistent with other warrant applications, the judge, after a hearing, found that the affiant was credible, the affiant's explanation for the apparent inconsistencies acceptable, and that the affidavit in support of the warrant application "did not contain misrepresentations sufficient to 'cast a reasonable doubt on the veracity of material representations made by the affiant concerning a confidential informant.' " *Ibid.*, quoting from *Commonwealth* v. *Padilla*, 42 Mass. App. Ct. 67, 72 (1997). On appeal in *Alcantara*, the defendant argued that the failure of the judge to conduct an in camera *Amral* hearing in which the affiant was required to disclose the identity of the informant or informants was an abuse of discretion. Noting there was no showing of clear error

---

[17]He also argues that there are a number of other matters which are suspicious, including that the records of the District Court clerk's office do not show issuance of the warrant and the signature of the clerk on the warrant varies significantly from the stamped signature of the same clerk on another warrant.

in the judge's findings of fact, and that the challenge to the judge's decision was nothing more than an argument about the affiant's credibility, an area in which deference is given to the motion judge, we held that there was no abuse of discretion in the judge's acceptance of the affiant's explanation and that an *Amral* hearing was not needed.

In the present case, the prosecution supplied the judge with information that satisfied him that there were no misrepresentations. Despite the fact that withholding of information had been shown, there was no indication of intentional misrepresentation. Gauvin had been the primary prosecution witness at trial, and the judge had observed him and could assess his credibility. In his memorandum requiring additional discovery from the Commonwealth, the judge correctly pointed out that "the presence of misstatements or omissions in record-keeping on the buy monies and drugs involved in the controlled buys adding up to negligence" would not require either a *Franks* or *Amral* hearing. See *Commonwealth* v. *Nine Hundred and Ninety-Two Dollars*, 383 Mass. 764, 767 (1981).

Implicit in his decision denying the motion for a new trial was a finding that Gauvin was credible, that the discrepancies and late production were most likely the product of negligence and that, in any event, there were no misrepresentations sufficient to "cast a reasonable doubt on the veracity of material representations made by the affiant concerning a confidential informant." *Amral, supra* at 522.

Although the judge did not hold a preliminary hearing, as the judge did in *Alcantara, supra* at 595, the motion judge here ordered additional discovery, examined the documents that had been provided, and required an additional affidavit from Gauvin in which he swore to the authenticity of the documents. In following this course, the judge did not abuse his discretion in accepting the documents as authenticated by Gauvin and, based on this material and his assessment of Gauvin's credibility during trial, in determining that an *Amral* hearing was not necessary.

*Judgments affirmed.*

*Order denying motion for new trial affirmed.*