## COMMONWEALTH *VS.* RONALD MENDES
### (and six companion cases[1]).

No. 08-P-1942.

Middlesex. February 1, 2010. - December 28, 2010.

Present: BERRY, COHEN, & KATZMANN, JJ.

Further appellate review granted, 459 Mass. 1104 (2011).

*Controlled Substances. Evidence,* Certificate of drug analysis, Expert opinion, Telephone conversation. *Constitutional Law,* Confrontation of witnesses, Harmless error. *Error, Harmless. Practice, Criminal,* Confrontation of witnesses, Harmless error, Warrant. *Search and Seizure,* Warrant.

At the trial of complaints charging possession of controlled substances with intent to distribute, and doing so near a school or park, the admission in evidence of certificates of drug analysis, without affording the defendants an opportunity to cross-examine the chemical analyst who prepared them, in violation of the defendants' rights under the confrontation clause of the Sixth Amendment to the United States Constitution, could not be said to have been harmless beyond a reasonable doubt, where, despite the defendants' admissions during their testimony to being substantial users of drugs, and their use of the nomenclature "marijuana" and "cocaine," the defendants made no direct admissions about the composition of the charged substances, and there was not overwhelming evidence, apart from the erroneously admitted certificates, of the actual nature of the substances forming the basis of the charges. [478-482] BERRY, J., dissenting.

A District Court judge did not err in denying the criminal defendants' pretrial motions to suppress evidence discovered during the execution of a search warrant at their apartment. [482-483]

At a criminal trial, a police officer's expert testimony did not exceed permissible bounds. [483]

At the trial of complaints charging possession of controlled substances with intent to distribute, and doing so near a school or park, there was no error in the admission in evidence of a police officer's testimony concerning calls placed to the criminal defendants' cellular telephones, where the testimony was not inadmissible hearsay, but rather was offered for the nonhearsay purpose of establishing that the telephones were instrumentalities employed by the defendants to facilitate drug sales, and where the judge was not required, sua sponte, to give a limiting instruction. [483-484]

COMPLAINTS received and sworn to in the Somerville Division of the District Court Department on October 24, 2006.

[1]Two against Ronald Mendes, and four against Raymond B. Mendes.

Pretrial motions to suppress evidence were heard by *Sabita Singh*, J., and the cases were tried before *James L. LaMothe, Jr.*, J.

*Valerie A. DePalma* for Ronald Mendes.

*Pamela Symmes Segre* for Raymond B. Mendes.

*William G. Allensworth*, Assistant District Attorney, for the Commonwealth.

COHEN, J. In March, 2008, after a jury trial in the District Court, the defendants, brothers Ronald Mendes and Raymond Mendes,[2] were convicted of several violations of the controlled substances laws.[3] On appeal, they claim that the admission of certificates of drug analysis to prove the charges against them was constitutional error that was not harmless beyond a reasonable doubt. They also claim that their motions to suppress evidence found during the execution of a search warrant at their apartment should have been allowed; that expert testimony from a police witness exceeded permissible bounds; and that testimony concerning telephone calls placed to their cellular telephones and heard by police should not have been admitted.

While none of the other issues has merit, we conclude that the admission of certificates of drug analysis in violation of the defendants' rights of confrontation requires that their convictions be reversed.[4] Based upon our understanding of the relevant cases, we reach this conclusion even though both defendants

---

[2] Because the defendants are brothers who share the same surname, we will refer to them by their first names.

[3] Both Ronald and Raymond were convicted of possession of a class B substance (cocaine) with intent to distribute, in violation of G. L. c. 94C, § 32A(*a*); possession of a class D substance (marijuana) with intent to distribute, in violation of G. L. c. 94C, § 32C(*a*); and a drug violation in a school or park zone, in violation of G. L. c. 94C, § 32J. Raymond was also convicted of possession of a class B substance (ecstasy), in violation of G. L. c. 94C, § 34. The convictions of possession of marijuana with intent to distribute and Raymond's conviction of possession of ecstasy were placed on file. Prior to trial, conspiracy charges against both defendants were dismissed at the Commonwealth's request.

[4] Although we ordinarily do not consider appeals from indictments (or counts of a complaint) that have been placed on file, "we may do so, in our discretion, in a suitable case." *Commonwealth* v. *Spearin*, 446 Mass. 599, 606 (2006). We consider this to be a suitable case because the counts of the complaints that were placed on file, see note 3, *supra*, present issues identical to those raised by the convictions from which the appeals were taken.

testified at trial and, during that testimony, made admissions consistent with their defense that they were drug users, but not drug dealers. In this respect, we differ from our dissenting colleague.

1. *Background.* a. *The Commonwealth's case.* The Commonwealth adduced evidence that, on October 21, 2006, Detective James Hyde of the Somerville police department, along with several other police officers, executed a search warrant at the defendants' second-floor apartment at 98 Albion Street, a three-unit residential building located in Somerville, across the street from a public playground. When the police entered the apartment, Raymond was found near the rear bedroom of the apartment, and his brother Ronald was found in a different bedroom with his girlfriend.

The police presented the search warrant and advised both Raymond and Ronald of their Miranda rights. The defendants initially denied that any drugs were in the apartment, but Raymond later admitted that there were "some trees" — street slang for marijuana — in his bedroom.

Detective Hyde oversaw the search of the apartment. At trial, he and Detective Dominic Pefine, another member of the search team, testified as to the results. In Raymond's bedroom, police found a clear plastic bag containing .46 grams of what was assumed to be cocaine and two pills that were identified as ecstasy, in a vase on top of the dresser; $740 in currency inside the dresser; and a black box under the bed that contained a bag of what was assumed to be marijuana, as well as $420 in currency, a 100-gram weight of a type used with a triple-beam scale, and a cellular telephone. In Ronald's bedroom, police found a plastic bag containing 1.46 grams of what was assumed to be cocaine on the bureau; twelve bags of what was assumed to be marijuana in the pocket of a shirt in the closet; $943 in currency in the closet; $158 in currency on top of a television set; and a cellular telephone. In the living room, police found a brown leather jacket containing two bags of what was assumed to be marijuana; various papers belonging to the defendants; a plastic baggie with the corner ripped off; three cellular telephones; and two notebooks containing lists of names and dollar amounts.

Detective Hyde stated that he was familiar from his training

and experience with both cocaine and marijuana and how these substances are ingested. Detective Pefine also testified that he was familiar with marijuana. Both officers described the general physical appearance of marijuana as a green leafy herbal substance. Through the testimony of Detective Hyde, the drugs seized were identified and admitted in evidence along with seven corresponding certificates of drug analysis prepared by the State laboratory.

While the search warrant was being executed, Detective Hyde monitored incoming telephone activity on the defendants' cellular telephones. Approximately ten to twelve calls came in during this period. According to Detective Hyde, all of the callers alluded to purchasing drugs, several calls were very brief, and most callers did not identify themselves.

Detective Hyde described two calls in detail. One was from an individual who identified himself as Ed and asked to purchase $100 worth of cocaine. Detective Hyde informed him that he could fill the order and directed Ed to the intersection of Albion and Lowell Streets. When Ed reached that location, he placed a second telephone call to Detective Hyde, who sent a marked cruiser over. As the cruiser approached, Ed called again, saying that he should not be met at that intersection because the police were there.

The second call was from a woman who also sought to buy drugs. She asked for Ray or Ron and then asked to purchase cocaine for herself and marijuana for her niece. Detective Hyde said that he could satisfy her request and directed her to a nearby liquor store. Again, he sent a marked cruiser to the designated location. The woman later called and indicated that she had been stopped by the police, but still wanted to purchase drugs.

Detective Sergeant David Montana, the head of the Medford police department's drug-control unit, testified as an expert witness for the Commonwealth. Among other things, he explained what cocaine and marijuana look like, the forms they may take, and how they are ingested and packaged for sale. He stated that he "believe[d]" one substance in evidence was "about half a gram" of cocaine and that another substance "appear[ed] to be marijuana." In response to a hypothetical question, it was his

opinion that the summary of the evidence put to him was not consistent with personal use.

b. *The defendants' case.* The theory of the defense was that the brothers were drug users, but not drug dealers, and that any drugs found in their apartment were for their own use. Ronald introduced the testimony of a friend who stated, among other things, that he would smoke marijuana with Ronald. Raymond introduced the expert testimony of Dr. Alan Wartenberg, a physician who specializes in the treatment of addiction and who described the consumption and purchasing habits of heavy drug users. In addition, each defendant testified on his own behalf.

Raymond testified that the records found by the police were for the purpose of keeping track of money that the defendants' friends had donated to help them buy music studio time for Raymond's son, an aspiring musician. He also offered benign explanations for the presence of the significant amounts of cash found in the apartment. As for his drug use, Raymond said that he would purchase an ounce of marijuana each week and that he would roll the marijuana into a "blunt" cigar, sprinkle cocaine on top, and smoke it. He stated that he kept "the drugs" in the places where Detective Hyde said he found them in order to hide them from Ronald's children, who would come to visit. He also explained that he took ecstasy pills as a sex drug when "a lady friend" came to visit.

Ronald testified that he smoked marijuana every day, three to four times per day, and that he also used cocaine approximately three times per week. Like Raymond, he offered innocent explanations for the presence of cash in the apartment. He admitted that the bags of marijuana found in the pocket of the shirt in his closet and in the jacket in the living room were his, explaining that he had purchased marijuana for his personal use from a dealer who only sold it in "dime bags," rather than in larger quantities. He also acknowledged that the cocaine found in his room was his.

2. *Certificates of drug analysis.* The Commonwealth had the burden to prove beyond a reasonable doubt that the substances seized from the defendants' apartment actually were marijuana, cocaine, and ecstasy. *Commonwealth* v. *Vasquez*, 456 Mass. 350, 361 (2010). As held by the United States Supreme Court in

*Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009), the admission of the certificates of drug analysis to meet the Commonwealth's burden, without affording the defendants the opportunity to cross-examine the chemical analyst who prepared them, violated the defendants' rights under the confrontation clause of the Sixth Amendment to the United States Constitution. Although the defendants did not object, on confrontation grounds, to the admission of the certificates at trial, because their case was tried after the Supreme Judicial Court's decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005), and before the issuance of *Melendez-Diaz*, they are entitled to have this constitutional error reviewed under the "harmless beyond a reasonable doubt" standard. *Vasquez, supra,* at 356-360.

"[T]o establish harmlessness beyond a reasonable doubt, the Commonwealth must show that other properly admitted evidence of guilt is 'overwhelming,' in the sense that it is 'so powerful as to "nullify any effect"' that the improperly admitted evidence 'might have had' on the fact finder or the findings." *Id.* at 362, quoting from *Commonwealth* v. *Tyree*, 455 Mass. 676, 704 n.44 (2010). "We pay particular attention to whether the Commonwealth's case 'radiates from a core of tainted evidence.' " *Commonwealth* v. *Fluellen*, 456 Mass. 517, 526 (2010), quoting *Tyree, supra* at 702. "[W]here the improperly admitted evidence directly implicates the Commonwealth's proof of an element of the crime, our inquiry must necessarily focus on the effect of the improperly admitted evidence as it pertains to that element." *Vasquez, supra* at 362.

In this case, although the Commonwealth introduced abundant properly admitted evidence of drug dealing, this evidence did not establish that the substances seized actually were cocaine, marijuana, and ecstasy as charged in the criminal complaints against the defendants. See *Vasquez, supra* at 366. See also *Commonwealth* v. *Morales*, 76 Mass. App. Ct. 663, 668 (2010). Other than the certificates of drug analysis, the Commonwealth's evidence bearing in any respect on the nature of the substances consisted only of general descriptions by the police witnesses of the typical appearance of cocaine and marijuana, the conclusory use by witnesses of the words "cocaine" and "marijuana" to describe the substances found, the testimony of Detective

Montana that he "believe[d]" one substance was "about half a gram" of cocaine and that the other substance "appear[ed] to be marijuana," and Raymond's statement to Detective Hyde that there were "some trees" in his bedroom. This evidence is comparable to, and no stronger than, evidence in other cases where it has been held that the potent evidentiary effect of erroneously admitted certificates was not nullified. See *Vasquez, supra* at 365; *Commonwealth* v. *Rivera,* 76 Mass. App. Ct. 67, 69-70 (2009), *Commonwealth* v. *Melendez-Diaz,* 76 Mass. App. Ct. 229, 233 (2010); *Commonwealth* v. *Pimentel,* 76 Mass. App. Ct. 236, 239 (2010); *Commonwealth* v. *Rivas,* 77 Mass. App. Ct. 210, 212 (2010); *Commonwealth* v. *Hernandez,* 77 Mass. App. Ct. 259, 263 (2010); *Commonwealth* v. *Barbosa,* 77 Mass. App. Ct. 340, 344-345 (2010).

The Commonwealth maintains, however, that we also must take into account evidence admitted during the defendants' case — in particular, the defendants' own testimony concerning their drug use.[5] We are unconvinced that it is appropriate for us to do so. The Supreme Judicial Court has indicated on more than one occasion that, short of a stipulation as to the nature of the drugs — which, by express agreement, conclusively establishes the facts contained therein — the Commonwealth is not relieved of its burden of proving the composition of the substances in question with properly admitted evidence. *Commonwealth* v. *Vasquez, supra* at 361, 368. This is so even where the defense strategy is to concede possession and contest only the defendant's intent to distribute, and even where the defendant has conveyed through words or conduct that the items in question are drugs. See *Commonwealth* v. *Charles,* 456 Mass. 378, 383 (2010); *Commonwealth* v. *Fluellen, supra* at 526-527.[6]

We disagree with the dissent that admissions coming in the

---

[5]The Commonwealth also relies upon the testimony of Dr. Wartenberg, who described the contents of one of the exhibits as "a white powder in a plastic bag inside of a plastic bag that is consistent with cocaine." Again, in conformity with *Vasquez, supra,* and the Appeals Court cases cited above, this testimony is inconclusive and of minimal value in proving the actual composition of the substance.

[6]The recent case of *Commonwealth* v. *DeMatos,* 77 Mass. App. Ct. 727, 731-732 (2010), does not detract from this analysis. In *DeMatos,* it was the Commonwealth, during its case-in-chief, that introduced admissions made by the defendant to the police when they entered his apartment. These admis-

form of the defendants' sworn testimony at trial stand on a special footing and may form the basis for concluding that the admission of the certificates was harmless. In this regard, the case of *Commonwealth* v. *Charros*, 443 Mass. 752, cert. denied, 546 U.S. 870 (2005), is instructive. In *Charros*, one of the issues presented was whether the erroneous admission of incriminating evidence that should have been suppressed (money found in the defendant's purse when she was illegally seized by police) was harmless beyond a reasonable doubt. In confronting that issue, the *Charros* court was required to consider the significance of the defendant's own trial testimony explaining and thereby admitting possession of the erroneously admitted evidence. After noting that there were conflicting views among courts and commentators on the point, the court rejected the Commonwealth's argument that the defendant's testimony rendered the error harmless beyond a reasonable doubt, observing that "[i]t is virtually impossible to say, on this record, whether [the defendant] would have testified had the evidence been suppressed." *Id.* at 766. Similarly, in the present case, we cannot know whether the defendants' testimony was a response to the erroneous admission of the certificates and hence tainted by the error. We therefore conclude that we should not consider their testimony in analyzing the question of harmlessness, lest we compound the prejudicial effect of the certificates' admission.

Unlike our dissenting colleague, we see no determinative distinction between this case and *Charros*. No less than in *Charros*, the defendants' testimony went to a potentially outcome-determinative issue; and, no less than in *Charros*, the defense strategy, including the defendants' decision to testify and any concessions made by counsel, was based upon the hand they were dealt. The defendants may well have made choices in light of the existing state of the law in Massachusetts, which allowed the Commonwealth to use certificates of drug analysis, without more, to meet its burden of proof as to the nature of the substances

---

sions, as well as the observations of the police witnesses, established, among other things, that the defendant had been ingesting cocaine when the police arrived and was exhibiting the effects of drugs apparently from the same supply that was seized during the police search. In these circumstances, "the evidence that the composition of the drugs in the apartment was cocaine was so powerful that the certificates had little or no effect on the verdicts." *Id.* at 732.

forming the basis of the charges. See *Vasquez, supra* at 359-360, & 368 n.21.

In any event, even if we were to take the defendants' testimony into account, we would not be assured that the impact of the drug certificates was nullified. While they admitted to being substantial users of drugs, and used the nomenclature "marijuana" and "cocaine" during their testimony, the defendants made no direct admissions about the *composition* of the charged substances. Compare *Commonwealth* v. *Villatoro*, 76 Mass. App. Ct. 645, 652-653 & n. 11 (2010).[7] In short, when the issue properly is framed as whether there was overwhelming evidence, apart from the erroneously admitted certificates, of the actual nature of the substances forming the basis of the charges, we must conclude that there was not, whether or not the defendants' evidence is included in the analysis.

3. *Other issues.* The defendants' remaining arguments require little discussion.

a. *Search warrant.* There is no merit to the claim that the affidavit submitted by Detective Hyde in support of the application for a search warrant failed to establish the veracity of the two confidential informants referenced therein, and, hence, did not supply probable cause. See generally *Commonwealth* v. *Upton*, 394 Mass. 363, 369-377 (1985) (adopting *Aguilar-Spinelli*[8] standard for purposes of art. 14 of the Massachusetts Declara-

---

[7]Our dissenting colleague places emphasis on *Villatoro* to support her position. The factual situation presented in *Villatoro* was, however, quite different. Unlike this case, *Villatoro* involved only one defendant who was charged with possession of only one drug, marijuana, with the intent to distribute. A police officer, implicitly found by the judge to be qualified, testified that he "recognized the odor of marijuana when he approached the defendant based on (the officer's) own experience, including hundreds of marijuana arrests." *Id.* at 654. Therefore, in addition to the defendant's testimony, there was powerful expert testimony of physical observations identifying the nature of the substance.

Here, the counts of the complaint charged that Ronald possessed two illegal substances, cocaine and marijuana, with the intent to distribute, while Raymond was charged with those same crimes as well as possession of ecstasy. Seven different certificates of analysis were admitted at trial. For the defendants to be convicted of the five counts pertaining to drug possession, it was necessary to prove that the illegal substance specified in each count was, indeed, that substance.

[8]*Aguilar* v. *Texas*, 378 U.S. 108 (1964). *Spinelli* v. *United States*, 393 U.S. 410 (1969).

tion of Rights). The affidavit established that the identity and places of residence of both informants were known to Detective Hyde, see *Commonwealth* v. *Welch*, 420 Mass. 646, 651 (1995); that the information provided by both informants was extremely detailed, see *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 376 (2003); that the informants corroborated each other; and that the information they supplied was further corroborated by police investigation and observation. Most significantly, the second informant engaged in two controlled buys, both within seven days of the application for the search warrant. See *Commonwealth* v. *O'Day*, 440 Mass. 296, 301 (2003).

Contrary to Raymond's position, it was not necessary for Detective Hyde to have personally observed the actual controlled buys. See *Commonwealth* v. *Luthy*, 69 Mass. App. Ct. 102, 106-108 (2007). Furthermore, the magistrate was entitled to conclude, for purposes of issuing the search warrant, that the substance purchased by the informant was, in fact, cocaine. See *Commonwealth* v. *Byfield*, 413 Mass. 426, 430 (1992).

Ronald's additional contention that there was an insufficient nexus between any drug activity and the brothers' apartment is also groundless. In addition to two controlled buys made by the second informant, where the defendants were observed leaving their apartment and traveling directly to the prearranged buy location close to their residence, the first informant directly observed more than twenty cocaine and marijuana sales in the apartment and provided detailed information about where drugs and paraphernalia were kept at that location. Contrast *Commonwealth* v. *Pina*, 453 Mass. 438, 442 (2009).

b. *Expert opinion.* Detective Montana's opinion testimony did not exceed appropriate bounds. He provided general, educational information for the jury about the significance of certain facts and whether they were consistent with drug distribution rather than personal use. A hypothetical question posed to him, which closely reflected the trial evidence, was not impermissible. See *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 579 (1998).

c. *Calls to defendants' cellular telephones.* For the first time on appeal, the defendants contend that Detective Hyde's testimony concerning calls placed to the defendants' cellular

telephones was inadmissible hearsay and violated their rights of confrontation.[9] It is evident, however, that the testimony was not offered for the truth of the statements made by the callers, but, rather, was offered for the nonhearsay purpose of establishing that the telephones were instrumentalities employed by the defendants to facilitate the sale of drugs. The defendants' intent to distribute was the core issue in the case, and the prosecutor used the testimony concerning the telephone calls to argue that the defendants had organized and equipped themselves to sell, and not merely to use, drugs. Because the testimony was not hearsay, the confrontation clause was not implicated. See *Crawford* v. *Washington*, 541 U.S. 36, 59 n.9 (2004); *Commonwealth* v. *Brum*, 438 Mass. 103, 116 (2002).

The defendants' alternative argument that the judge was required sua sponte to give a limiting instruction when this testimony was received is without merit. See *Commonwealth* v. *Washington*, 449 Mass. 476, 488 (2007).

4. *Conclusion.* Because we are unable to determine that the admission of certificates of drug analysis played little or no role in the outcome of the case, we conclude that this constitutional error was not harmless beyond a reasonable doubt. Accordingly, the defendants' convictions are reversed, and the verdicts set aside.

*So ordered.*

BERRY, J. (dissenting in part). With due respect, I dissent from that part of the majority opinion which holds that the admission of the drug certificates was not harmless beyond a reasonable doubt. I also depart from the majority in the suggestion that it is not the whole trial record — Commonwealth case-in-chief and defense case — which is to be considered in determining the question whether an error, here the admission of the certificates, was harmless beyond a reasonable doubt.[1]

---

[9]At oral argument, we requested further briefing as to whether listening to the calls violated G. L. c. 272, § 99. After review of the postargument submissions, we are persuaded that there was no unlawful electronic interception within the definition of G. L. c. 272, § 99.

[1]I concur with the majority analysis that there was no error arising out of the informant information in the search warrant or in the questioning and

*Consideration of the entire trial record of prosecution and defense evidence.* Under *Commonwealth* v. *Vasquez*, 456 Mass. 350 (2010), the standard of review is whether the error in the introduction of the drug certificates was harmless beyond a reasonable doubt. In reviewing whether an error is so harmless, it is the trial record in its entirety, including both the Commonwealth's and the defendants' evidence, that is to be considered. "[A]n appellate court must ask 'whether *on the totality of the record* before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts.' " *Id.* at 369 (Cordy, J., concurring in part and dissenting in part), quoting from *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010) (emphasis supplied). Because it is the entire trial record that is to be considered, I disagree with the majority that, "we should not consider [the defendants'] testimony in analyzing the question of harmlessness." *Ante* at 481.

Various factors are to be weighed, including, but not limited to, "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense . . . [and] whether the erroneously admitted evidence was merely cumulative of properly admitted evidence." *Vasquez*, 456 Mass. at 360 n.12, quoting from *Tyree*, 455 Mass. at 701.

*The defendants' testimony rendered the error in the admission of the drug certificates harmless beyond a reasonable doubt.* Contrary to the majority, I would conclude that the admission of the drug certificates was harmless error, because in addition to other expert evidence concerning what the substances were, both defendants — in order to explain the existence of the cocaine and marijuana found in their rooms and in other parts of the apartment — took the stand at trial, acknowledged that the drugs were theirs, and explicitly admitted in their testimony that the substances were, in fact, cocaine and marijuana, the defendants contending only that these controlled substances

testimony of the Commonwealth's drug expert. Indeed, I believe that the evidence provided by the prosecution drug-qualified expert and defense drug-qualified expert is to be added to the defendants' testimony in support of the determination that the error in the admission of the drug certificates was harmless beyond a reasonable doubt. See further discussion herein.

were being held for personal use. The defendant Ronald Mendes testified that the marijuana and cocaine seized in his room belonged to him, and that he smoked marijuana every day and used cocaine three times a week, sometimes adding the cocaine to his "weed" and making a "blunt." The defendant Raymond Mendes acknowledged that he kept cocaine and marijuana in the apartment, used these substances himself and with his codefendant twin brother Ronald,[2] and also acknowledged that he gave the substances to guests, "do[ing] the blunt and the cocaine . . . that's when I have a lady friend come over." Raymond offered details about how to roll the marijuana into a "blunt" cigar by taking out the tobacco.

All of this was powerful substantive evidence, direct from the mouths of the defendants, that the substances were, in fact, cocaine and marijuana. In addition, the defense offered an expert on addictive drug use, who described the practice of using cocaine and marijuana — seeking to buttress and corroborate the defendants' testimony to the effect that, even if the marijuana and cocaine taken from the apartment belonged to the defendants, the drugs so held by the defendants would be consistent with personal consumption, rather than distribution. There was also expert testimony in the Commonwealth's case-in-chief by a qualified police expert who examined the exhibits containing the controlled substances, described what cocaine and marijuana look like, and stated that the substances packaged in the exhibits appeared to be cocaine and marijuana.

Thus, apart from, and cumulative to, the drug certificate evidence, the defendants' testimonial admissions, the defense drug expert's corroborating evidence, and the prosecution drug qualified drug expert, taken in totality, provided persuasive probative evidence that the substances were cocaine and marijuana. Therefore, applying the standards from the *Vasquez* and *Tyree* cases quoted above, in my opinion, this other independent evidence rendered the error in admission of the drug certificates harmless beyond a reasonable doubt.

To be noted is that all of this other drug identifying information was introduced at trial as substantive evidence. Hence, this

[2]Because the defendants share the same surname, I refer to them by their first names.

is not case in which, in counter to the government's evidence, a defense strategy is advanced not by introducing evidence in the defense case (including, perhaps, as here by the defendants' testimony), but rather the defense strategy is pursued though the means of counsel's opening statement and closing argument, and counsel's interrogation of witnesses in an effort to persuade the fact finder at trial, that, even assuming illicit drugs were present, such drugs were for personal use.[3] To the contrary, there was more than a defense theory advanced in this case; instead, substantive evidence was developed of and concerning the subject drugs being cocaine and marijuana. Given this substantive evidence, the principle applies to this case that, "[p]roof that a substance is a particular drug need not be made by chemical analysis and may be made circumstantial evidence." *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987). "[S]uch evidence may be 'so powerful' as to 'nullify any effect' that the drug certificates 'might have had on the jury or the verdict[s].' " *Commonwealth* v. *Charles*, 456 Mass. 378, 381-382 (2010), quoting from *Tyree*, *supra* at 704 n.44.

That the most probative testimony concerning the nature of the unlawful controlled substances was forthcoming in the defendants' own words — and reflected a wealth of experience

[3]Formulating a strategy and theory of defense is quite different from introducing substantive evidence defining and identifying the subject controlled substances. Indeed, the presence of the substantive evidence stemming from the defendants' testimonial admissions and the defense expert evidence (as well as the qualified police expert evidence) distinguishes this case from *Commonwealth* v. *Fluellen*, 456 Mass. 517 (2010), and *Commonwealth* v. *Charles*, 456 Mass. 378 (2010). In *Fluellen*, the defense theory was not to contest that the substances were crack cocaine, but to assert that the cocaine was for personal use. This defense strategy was developed only via attorney argument and cross-examination. Similarly, in *Charles*, defense counsel referred to the substances as marijuana and crack cocaine in opening statement, examination, and closing argument. But there was not substantive evidence or any stipulation in *Charles* concerning what the substances were. Thus, in holding in the *Charles* case, that the error in admitting the certificates was not harmless beyond a reasonable doubt, the court noted that, "the arresting police officers, neither of whom was qualified as an expert in or had specialized training or experience in narcotics identification, offered only conclusory, and largely equivocal, testimony regarding the composition of the substances. The officers certainly, 'did not articulate how their expertise permitted them to identify the substances' as cocaine and marijuana." *Id.* at 382, quoting from *Commonwealth* v. *Melendez-Diaz*, 76 Mass. App. Ct. 229, 233 (2010). That is quite different from the evidence in this case.

in using the drugs by these defendants — sharpens the proof line because it is each defendant who inculpated himself and provided direct substantive, probative evidence about the nature of the controlled substances. Thus, in this case, the defendants' trial testimony and defense evidence went far to prove the nature of the drugs. In my judgment, a defendant cannot have it both ways, i.e., take the stand at trial and testify that the controlled substances were particular drugs, and then shift stance to contend on appeal that a conviction was fraught with error because certificates of drug analysis were introduced. Such switches are, in effect, a disavowal of the defendant's testimonial acknowledgment under oath that the substances were certain unlawful substances, here cocaine and marijuana. Here, in considering whether the error in admitting the drug certificates was harmless beyond a reasonable doubt, the defendants should be held to their words under oath at trial. Cf. *United States* v. *Havens*, 446 U.S. 620, 626-627 (1980) (this Court has "repeatedly insisted that when defendants testify, they must testify truthfully or suffer the consequences. . . . The defendant's obligation to testify truthfully is fully binding on him").

To the defendants' testimony, I would add, in the harmless error calculus, the prosecution's police expert who described what cocaine and marijuana look like, and the various forms of these controlled substances and methods of packaging for sale, and the theme of the defense drug expert that, even though cocaine and marijuana may were involved, such drugs may be for personal use. All this evidence, when bundled — and even when assessed apart from the chemical analysis in the erroneously admitted drug certificates — brings this case within the core of the class of substantive and circumstantial evidence which *Commonwealth* v. *Dawson, supra,* held may prove the nature of an unlawful drug.

The majority relies on *Commonwealth* v. *Charros,* 443 Mass. 752, cert. denied, 546 U.S. 870 (2005). But I do not see *Charros* as providing legal justification for the defendants being able to say one thing at trial under oath — acknowledging that the controlled substances were cocaine and marijuana and offering a defense drug expert to the same effect — but, then postconviction, on appeal, stepping away from the defense evidence presented.

First, I do not believe that *Charros*, which involved a defendant's trial testimony following the erroneous denial of a suppression motion, is apposite. In *Charros*, the court focused on the prejudicial effect of the defendant's testimony, which may not have been given had the evidence been suppressed. Specifically, the defendant's trial testimony that she had taken money from a strong box provided a critical link to the twenty-eight grams of cocaine. The point is: there was an important and potentially outcome-determinative contested issue in *Charros* concerning whether the defendant had knowledge that cocaine was being held in the apartment for distribution, versus a defense position that she was not aware of her husband's drug business. In this case, there is no such contested defense issue, given the defendants' concessions that the drugs were cocaine and marijuana, albeit supposedly held for personal use.

A second reason *Charros* is inapposite is that the court noted in that case that, "[i]t is virtually impossible to say, on this record, whether [the defendant] would have testified had the evidence been suppressed." *Id.* at 766. That is absolutely not so in this case. To the contrary, it is perfectly clear from the case record here — beginning with trial counsels' openings that the defendants would testify, would acknowledge that the substances were cocaine and marijuana, and would offer expert evidence to that end.[4]

---

[4]In concession about the controlled substances at issue, defense counsel for the defendant Ronald Mendes previewed the defense evidence to be introduced:

> "My client is here for one reason and one reason only, to say he's not guilty of possession with intent, possession of intent of cocaine, possession with intent of marijuana. *My client is going to concede that he had marijuana in his house and had cocaine in his house, but those were for his own personal use, they were not for the purpose of distributing to anybody else*" (emphasis added).

Trial counsel for defendant Raymond Mendes, although not using the word "concede," provided a similar preview of the defense evidence which, in effect made a similar concession.

> "In this case that it's the important for you to listen to everything that the officers tell you, but also what Ray Mendes will tell you.

> "A couple of the officers searched his bedroom, and he will tell you, in fact, he will tell you like he told the police exactly where the marijuana was.

> ". . .

Third, looking to *Charros*, the majority concludes that the defendant's testimony is not "countable" because the government has the burden of proof on all elements of a case. That is, of course, so. But, we are not here considering appellate review of a motion for a required finding of not guilty at the close of the government's case, where only the evidence in the Commonwealth case-in-chief counts. Rather, we are reviewing the entire case record, including the defense case — all, I submit, to be counted in the harmless beyond a reasonable doubt analysis. For these reasons, *Charros*, in my view, cannot be read to warrant reversal in this case because of the *Melendez-Diaz* and *Vasquez* error.

In certain respects, this case is similar to *Commonwealth* v. *Villatoro*, 76 Mass. App. Ct. 645, 652 (2010), in which we held that admission of the drug certificates was harmless beyond a reasonable doubt. In that case, "[t]he defendant not only admitted that the substance in question was marijuana, he testified at length on the subject, asserting the distinction between different grades of 'weed,' explaining why he also had smoking implements and baggies on his person, and detailing his experience and long history of marijuana use. . . . Additionally, the arresting officer recounted that he had received Drug Enforcement Administration task force training and ATF drug recognition training; he testified further that he also recognized the odor of marijuana when he approached the defendant based on his own experience, including hundreds of marijuana arrests." *Id.* at 652-654.[5] In addition, the majority opinion in this case appears

---

"He will also tell you why the marijuana that they found in his house was located where it was, where the money was, what it's used for. So this case again will be as much about what the government witnesses tell you as it is about what Ray Mendes will tell you.

". . .

"And then finally there will be an additional witness on behalf of Ray Mendes, his name is Dr. Alan Wartenberg. For the past twenty plus years Dr. Wartenberg has worked closely with individuals who are addicted to all varieties of drugs. He will inform us all about how drugs are used, the quantities, sometimes surprisingly what will be used by an individual. And much like Sergeant Montana for the government, will explain what the tools of the trade are for, Dr. Wartenberg will explain how somebody that uses drugs, maybe even addicted to drugs consumes them."

[5]The majority in note 7 *ante*, emphasizes that in this case there were seven

to be inconsistent with the holding in *Commonwealth* v. *De-Matos*, 77 Mass. App. Ct. 727 (2010). In *DeMatos*, this court held that the error in admission of drug certificates was harmless beyond a reasonable doubt where the evidence was that the defendant, by an out-of-court admission, stated that he was using cocaine at the time of his arrest. This out-of-court admission was, in turn, buttressed by police officer's testimony that the defendant appeared "high" when apprehended. If, as in *De-Matos*, such an out-of-court admission, coupled with other evidence of drug distribution, rendered the admission of the drug certificates harmless error, I fail to see how an in-court admission by a defendant under oath, also buttressed by other evidence, is to be afforded less weight in the harmless beyond a reasonable doubt analysis. Yet, to accept the majority analysis is to do that, inconsistently with *DeMatos*. That is, while this court has in that latter case afforded weight to an out-of-court admission by a defendant, the majority opinion in this case would not afford equal or greater weight to a defendant's in-court testimony under oath that a substance is a particular unlawful drug, here, cocaine.

In sum, taking the defendants' testimonial admissions that the substances were cocaine, the defense expert evidence centering on these two controlled substances and the police expert testimony, I would conclude that the error in admitting the drug certificates was harmless beyond a reasonable doubt. "[S]o powerful [was all of this other evidence] as to nullify any effect that the improperly admitted evidence might have had on the fact finder or the findings." *Vasquez, supra* at 362 (internal quotations omitted).

For these reasons, I dissent.

certificates of analysis. I fail to see the significance of that enumeration vis-à-vis the harmless beyond a reasonable doubt question. Each of the defendants Ronald and Raymond were convicted of *one* count of possession of cocaine and *one* count of possession of marijuana. While separate certificates of analysis for the cocaine and marijuana would be required depending on the place of seizure within the apartment, the defendants were not charged with separate offenses dependent on where the cocaine was located. Thus, the essential issue remains whether the defendants' testimony that the substances were cocaine and marijuana rendered admission of the certificates harmless error.

Finally, as to the ecstasy count (which was on file and not detailed in the briefs), in my view, the same result obtains, as with the cocaine and marijuana, i.e., Raymond, in his testimony, acknowledged the substance seized was ecstasy.