## COMMONWEALTH vs. ANTHONY HERNANDEZ.

No. 09-P-12.

Essex. December 16, 2009. - July 16, 2010.

Present: MILLS, KATZMANN, & FECTEAU, JJ.

*Controlled Substances. Constitutional Law,* Confrontation of witnesses, Search and seizure. *Evidence,* Certificate of drug analysis. *Error, Harmless. Practice, Criminal,* Confrontation of witnesses, Required finding, Motion to suppress. *Search and Seizure,* Automobile, Protective frisk, Reasonable suspicion.

At the trial of a complaint charging unlawful possession of cocaine with intent to distribute and violation of the "school zone" law, the erroneous admission in evidence of a certificate of drug analysis without the opportunity for cross-examination of the forensic chemist who produced it, in violation of the defendant's constitutional right to confront witnesses against him, was not harmless beyond a reasonable doubt, where the Commonwealth did not show that other properly admitted evidence of guilt was overwhelming so as to nullify any effect the improperly admitted evidence might have had on the jury or the verdict. [263-264]

At the trial of a complaint charging, inter alia, unlawful possession of cocaine with intent to distribute, evidence that the defendant possessed a bag of cocaine which could have been broken down into the equivalent of fifty-six individual packages of an amount (i.e., one-quarter gram) typically sold on the street, as well as a cellular telephone and fifty-six dollars in cash, together with opinion testimony that the quantity of cocaine was consistent with distribution, was sufficient to sustain the defendant's conviction. [264-266]

A District Court judge properly denied a criminal defendant's pretrial motion to suppress evidence discovered by police during a patfrisk that was conducted when the police pulled over an automobile in which the defendant was a passenger after observing the vehicle engaging in activity suggestive of a drug transaction and then failing to stop at a red light, where the officer was justified in ordering the defendant to get out of the vehicle and pat frisking him, given that the officer observed the defendant shaking and sitting on his left hand, as well as being unable to produce identification and failing to answer whether he had any weapons. [266-269]

COMPLAINT received and sworn to in the Lynn Division of the District Court Department on June 5, 2008.

A pretrial motion to suppress evidence was heard by *Patricia A. Dowling,* J., and the case was tried before *Albert S. Conlon,* J.

*John O. Mitchell* for the defendant.

*Elin H. Graydon*, Assistant District Attorney, for the Commonwealth.

FECTEAU, J. The defendant appeals from convictions, following a jury trial in the District Court, of unlawful possession of cocaine with intent to distribute, G. L. c. 94C, § 32A(*a*), and violation of the school zone law, G. L. c. 94C, § 32J. On appeal, the defendant contends that his motion to suppress evidence was wrongly denied, and that the trial judge erred in denying his motion for a required finding of not guilty and in allowing in evidence a certificate of chemical analysis without affording the defendant his confrontation rights under the Sixth Amendment to the United States Constitution. We agree that reversible error occurred when the drug certificate was admitted in evidence. However, the defendant's motion to suppress and motion for a required finding of not guilty were properly denied. Therefore, we reverse the convictions and remand for a new trial.

*Background.* The jury could have found[1] that at approximately 8:00 P.M., on November 24, 2006, Detectives Ross Panacopoulos and Raymond Guillermo, two experienced Lynn police street-level narcotics investigators,[2] were on patrol in an unmarked police vehicle on North Common Street, identified as a high crime area. They saw a van parked on the side of the road with its headlights on and the engine running; the passenger door was open, one person was in the driver's seat, and another man (later identified as the defendant) was bent over behind a nearby dumpster. After a moment, they saw the man near the dumpster stand up, put his hands in his pockets, and enter the van by the open passenger door.

While Panacopoulos did not see any drugs in the defendant's hands, he was suspicious of this activity because it suggested to him either a typical narcotics "drug drop," explained as involving parties separately picking up and dropping off drugs and

---

[1] For ease of reference, we also include facts from the motion hearing, as pertinent to the defendant's motion to suppress. See note 12, *infra*. These have no bearing on the defendant's claims of error concerning the jury trial.

[2] The detectives had worked for the Lynn police department for a combined thirty-six years, more than twenty of which were with the special investigations unit, primarily focused on street-level narcotics investigations. With nearly eight years with the unit, Panacopoulos had been involved in "well over a thousand [narcotics] investigations."

money, or a drug stash outside a dealer's residence. Guillermo testified that, at that point, they did not know whether the defendant was picking up or dropping off drugs.

As the van drove off, the detectives followed, and a moment later they saw the van fail to stop at a solid red light. They called for the assistance of a marked cruiser, and the van was stopped without incident. Panacopoulos attended to the driver and requested his license and registration,[3] while Guillermo went to the passenger side.

Although the officers saw no suspicious movements, weapons, drugs, or drug paraphernalia as they approached the van, they testified that during motor vehicle stops they were apprehensive for their safety. As the officers drew up to the front seat of the vehicle, they could see the defendant, whom they identified as the man they had just seen behind the dumpster, seated in the front passenger seat sitting with his left hand hidden beneath his left thigh and his right hand shaking. Both detectives described the defendant as appearing very nervous and breathing heavily. When asked for his identification, the defendant was unable to provide any. When Guillermo asked if he had any weapons, the defendant turned his back to him and did not answer. When asked again, the defendant first hesitated but finally answered, "No." Because of the defendant's lack of response to Guillermo's first question whether he had any weapons, his movement turning away from Guillermo, and his hidden left hand, Guillermo became concerned for the officers' safety, and asked the defendant to get out of the car. The officer then pat frisked him for weapons, finding a cellular telephone in his right pants pocket; he felt "a bulge, like a ball" that he believed to be narcotics in the area of the left pants pocket, which he attempted to retrieve. The ball, a clear plastic bag filled with white powder, which the detective believed to be cocaine, was not in his pants pocket but instead in the pocket of a pair of athletic style shorts underneath his pants. The defendant was then arrested. During booking, the detectives also removed fifty-six dollars in cash.

[3]Panacopoulos questioned the driver of the van, who was responsive and produced a valid license and the van's registration upon request. Once the defendant had been placed in handcuffs, the driver was also asked to step out of the car and the van was searched. Ultimately, the driver was given a verbal warning for the traffic infraction and was allowed to leave.

On cross-examination, Panacopoulos acknowledged that the defendant's activity at the dumpster, combined with the discovery of cocaine in his inner pocket, would suggest that the defendant was a buyer, but he further opined, without objection, that the quantity of cocaine found in the defendant's pocket, the cellular telephone, and the fifty-six dollars found during the patfrisk were consistent with possession with intent to distribute. In Panacopoulos's experience, street sales typically involve amounts of cocaine up to one gram; the defendant had 13.98 grams, almost one-half ounce of cocaine. Neither in their search of the defendant nor in the car did the detectives find any other paraphernalia indicative of drug dealing; nor did they find any indicia of personal consumption of cocaine such as needles, "crack" pipes, "crack" stems, or rolling papers.

The Commonwealth's final witness was Lynn police Detective Michael Kelter.[4] Testifying as an expert, he identified the North Common Street area where the defendant was first seen behind the dumpster as a high drug crime area. He described typical street-level cocaine transactions in Lynn as involving one gram, one-half gram, or one-quarter gram bags, called "twists," being sold for twenty to forty dollars. He also testified that larger quantities of cocaine, such as five to six grams, are amounts more typical of purchases by a "mid level dealer," and can be broken down into smaller twists for sale to individual users. He expressed the opinion that a one-half ounce of cocaine is "not usually for personal use" because "[i]t's a lot of cocaine to have on hand" for one user, saying that the common practice of street-level users is to buy one or two small twists at a time because they do not have the money to buy larger quantities. He conceded that some people do acquire larger amounts for personal use, but in his experience on the streets of Lynn, one-half ounce of cocaine is "an awful lot of cocaine" for that purpose. He estimated that the amount of cocaine found on the defendant would sell for about $600 as a single package, but could be divided into fifty-six separate one-quarter gram twists, sold on the street at twenty dollars each.[5]

---

[4]Kelter had more than twenty years of experience in the department, primarily in the special investigations unit, and had conducted thousands of street-level narcotics investigations, including undercover buys.

[5]Apart from his challenge to the underlying controlled substance convic-

*Discussion.* 1. *Drug certificate.*[6] The United States Supreme Court has held that the admission of the certificate of analysis without an opportunity for cross-examination of the forensic chemist is error. See *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527 (2009). The defendant is entitled to a review under harmless error principles. *Commonwealth* v. *Vasquez*, 456 Mass. 350, 355-360 (2010). In determining whether the error was harmless, we ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Commonwealth* v. *Perez*, 411 Mass. 249, 260 (1991), quoting from *Chapman* v. *California*, 386 U.S. 18, 24 (1967).

It is settled that scientific analysis is not the only method to prove the nature of a substance, and that a properly qualified police officer may provide opinion testimony that a substance is a particular controlled substance. *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987). Even assuming that the trial judge implicitly found the officers qualified to give such opinion testimony because of their extensive experience in narcotics investigations, they were not asked to apply that expertise to identify the nature of the substance. Instead, each made an unsupported statement that he believed the substance was cocaine. "We suspect it would be a rare case in which a witness's statement that a particular substance looked like a controlled substance would alone be sufficient to support a conviction." *Ibid.* While such a statement might constitute some evidence, the prosecutor properly placed its importance in the over-all context of the Commonwealth's case when she said in closing: "The first charge, the first element. Is this cocaine? Well, you have it in front of you; and you have officers who testified that it looked like cocaine. But most importantly, you have the certificate from the State Police saying, yes; this is cocaine as it is defined, a controlled substance." Compare *Commonwealth* v. *Ware*, 76 Mass. App. Ct. 53, 57-58 (2009) (prosecutor's argument relying on ballistics certificate).

We are not persuaded that the admission of the certificate was harmless beyond a reasonable doubt. The Commonwealth

tion, the defendant does not challenge the sufficiency of the Commonwealth's evidence supporting the conviction of the school zone violation.

[6] We acknowledge the concession of error that was filed by the Commonwealth on July 8, 2010, as to the admission of the certificate of analysis.

did not show that other properly admitted "evidence of guilt was 'overwhelming,' in the sense that it was so powerful as to 'nullify any effect' the [improperly admitted evidence] might have had on the jury or the verdict." *Commonwealth* v. *Tyree*, 455 Mass. 676, 704 n.44 (2010), quoting from *Commonwealth* v. *Dagraca*, 447 Mass. 546, 555 (2006). See *Commonwealth* v. *Vasquez*, 456 Mass. at 363, 367. Thus, reversal is required.[7]

2. *Sufficiency of the evidence.*[8] The defendant contends that the trial judge improperly denied his motion for a required finding of not guilty because the evidence in this case, which most significantly included a bag of cocaine weighing 13.98 grams, a cellular telephone, and fifty-six dollars in cash, was insufficient to permit a guilty verdict. We disagree.

Specifically, the defendant claims that the Commonwealth's evidence implied that he was a buyer as much as a seller. He relies upon a familiar axiom: " 'When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof.' *Commonwealth* v. *Croft*, 345 Mass. 143, 145 (1962), quoting from *Commonwealth* v. *O'Brien*, 305 Mass. 393, 400 (1940)." *Commonwealth* v. *Eramo*, 377 Mass. 912, 913 (1979). The defendant's reliance on this axiom is misplaced because the circumstances of this case are not consistent with a typical street sale of cocaine. In *Commonwealth* v. *Senati*, 3 Mass. App. Ct. 304, 306 (1975), we held that a motion for a directed verdict should have been allowed where police officers observed an exchange on the street and were unable to see the direction of the transfer. In such a situation, where there is a small quantity of drugs and no additional evidence, the Commonwealth is faced with mutually inconsistent inferences because the evidence equally supports the inference of distribution as well as one of personal

---

[7]We proceed to address the defendant's remaining claims bearing on retrial since, if the motion for a required finding of not guilty was wrongly denied, the Commonwealth would be barred from retrying the defendant. *Commonwealth* v. *Kessler*, 442 Mass. 770, 771 n.2 (2004).

[8]Our analysis of the sufficiency of the evidence is inclusive of evidence that we hold to have been erroneously admitted. See *Commonwealth* v. *Taylor*, 383 Mass. 272, 284 (1981) (agreeing with " 'well reasoned' decisions [that do] not automatically bar retrial where an insufficiency of evidence appeared only when material held on appellate review to have been erroneously admitted was notionally removed from the case"); *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 45-46 (1992).

use. *Ibid.* See *Commonwealth* v. *Croft*, 345 Mass. at 144-145 (heroin worth about eighty dollars retail, and the defendant's statement that he had been a habitual user but kicked the habit about three weeks prior was not sufficient to overcome equally permissible but inconsistent inference of personal use); *Commonwealth* v. *Rodriguez*, 456 Mass. 578, 582-585 (2010); *Commonwealth* v. *Tripp*, 14 Mass. App. Ct. 997, 998-999 (1982). This case does not involve such a small amount of drugs; the drug expert opined that a typical package sold on the street is one-quarter of one gram. Here, the defendant was in possession of a bag containing 13.98 grams, which, as the expert permissibly stated, can be broken down into fifty-six one-quarter gram street bags.[9]

In *Commonwealth* v. *Latney*, 44 Mass. App. Ct. 423, 426 (1998), we recognized that:

> "[C]onfusion as to the application and meaning of th[e] frequently invoked [*Croft*] principle [as to equally probable, but inconsistent propositions, see *Croft*, 345 Mass. at 145,] is as widespread as its incantation. This is particularly so in the context of a motion for a required finding of not guilty, which must surmount the prosecution-friendly *Latimore* standard. [See *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979).] In fact, the concept pertains only to situations in which any view of the Commonwealth's evidence, however favorable, still requires a leap of conjecture with respect to essential elements of the crime charged in order to obtain a conviction."

(Footnote omitted.) See *Commonwealth* v. *Merry*, 453 Mass. 653, 663 (2009).

Here, the evidence and reasonably drawn inferences, viewed in a light most favorable to the Commonwealth, do not require such a speculative leap, since the Commonwealth's facts were not equally probative of innocence as of guilt. While acknowledging the innocent purposes of a cellular telephone and cash,

---

[9]Because the officer's opinion — that fifty-six twists could be derived from the 13.98 grams found on the defendant — was explanatory of the evidence, not conclusory, we disagree with the defendant's contention that the opinion testimony was improper. See *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 579 (1998) ("Questions grounded in previously admitted evidence may be posed to an expert witness calling for an opinion within the expert's field of expertise, even if the witness's reply thereby touches on the ultimate issue of the case").

an experienced drug officer was allowed to opine that those items, together with the quantity of cocaine found on the defendant, was consistent with distribution. "The 'equal probabilities' asserted by the defendant were either . . . inconsistent with reason and experience . . . or contrary to the evidence." *Latney, supra* at 425. The amount of drugs involved is not so small that only an inference of personal use is compelled; nor is it in equipoise with an intent to distribute. Contrast *Croft, supra.*

The quantity of cocaine seized from the defendant properly formed the basis for opinion testimony by one of the Commonwealth's witnesses that it was more consistent with distribution. Contrast *Commonwealth* v. *Tripp,* 14 Mass. App. Ct. at 998 ("there was nothing about the packaging, size or value of any of the bags to indicate that sales were intended"). "Here there was no evidentiary gap, merely a question of the weight of a continuous chain of circumstantial evidence strongly connecting the defendant directly to the [crime]. . . . While the jury would have been entitled to reject the Commonwealth's theory, its case was properly submitted to the fact finders for consideration and rationally supported [a] conviction[] beyond a reasonable doubt." (Citation omitted.) *Latney, supra* at 426. The motion for a required finding was properly denied.[10,11]

3. *Motion to suppress.* The defendant next contends that the

---

[10]The defendant's argument that a required finding was warranted by Panacopoulos's testimony that the defendant's activity at the dumpster, combined with the discovery of cocaine in his pocket, suggested that the defendant was a buyer, is unavailing. In his testimony, Panacopoulos further opined that, taken together, the cocaine in the defendant's pocket, the cellular telephone, and the fifty-six dollars were consistent with possession with intent to distribute. Moreover, viewed in the light most favorable to the Commonwealth, Panacopoulos's testimony does not exclude Kelter's opinion testimony that the defendant was a mid-level dealer, buying product from a higher-level dealer, and selling it on the street in smaller packages. Furthermore, even if Panacopoulos's testimony is considered inconsistent with the Commonwealth's theory, it would not warrant a required finding; there was sufficient evidence to send the question to the jury.

[11]The defendant's argument that the Commonwealth's case was weakened by the testimony of the defense expert has no merit. The defendant's expert, Anthony Rozzi, had been a pharmacist and a pharmacy manager, and became an attorney in 2004. He testified that the "approximately half an ounce" of cocaine found on the defendant would be the "upper limit" of usage by patients he encountered at the hospital where he had worked, and that even for a serious user, it would take two to three days to ingest that amount in

hearing judge should have allowed his motion to suppress because the stop and patfrisk violated his rights under the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. We disagree.

Following an evidentiary hearing, the judge made findings of fact and rulings of law, which are noted in the margin.[12] "We accept the judge's subsidiary findings absent clear error but

powder form. Even if this testimony is viewed as supportive of the defendant's theory of possession for personal use, the Commonwealth's case suffered no deterioration because Rozzi's background included little to no experience with cocaine users, cocaine addictions, or street-level drug investigations. While he had experience working with patients in "several clinical situations," including prescribing pain medication for chemotherapy patients, he had never worked at any drug or alcohol rehabilitation or detoxification facility. His work in the 1980s was at a methadone clinic treating heroin or opiate addicts. The trial judge properly denied the defendant's renewed motion for a required finding of not guilty.

[12]The motion judge found as follows:

"After an evidentiary hearing I find the following facts:

"Detectives Panacopoulos and Guillermo of the Lynn Police Special Investigations Unit are both extensively trained in street sales of narcotics, and both officers have many years of experience working the streets of Lynn. On the night in question, they were working in plain clothes in an undercover vehicle when they saw in front of 85 North Common Street a white minivan parked w/ its lights on, the motor running, and the passenger door wide open. The detectives saw the driver behind the wheel and a male bending down behind a dumpster not far from the vehicle. North Common Street is a high crime area where the detectives have made previous drug arrests, so their suspicions were raised.

"The detectives followed the van (after the male jumped into it) until they saw it go thru a red light (it failed to stop before turning right). They called a patrol car to stop the van and then approached from each side. Detective Guillermo approached the passenger, who was identified as the defendant, and saw that he did not have his safety belt on. Detective Guillermo observed the defendant passenger to be excessively nervous. His left hand was under his left leg and his right hand was shaking. Det. Guillermo asked the defendant what his name was and requested identification. He was unable to produce ID. When asked if he had any weapons, the defendant first looked away, ignoring the question. When asked again, he hesitated, then said no.

"Concerned for his safety Det. Guillermo directed the defendant to step out of the vehicle and he conducted a pat frisk. The defendant had a cell phone in his pants pocket and Det. Guillermo, in another pocket, felt what he believed was drugs (powder). This was somewhere under

conduct an independent review of his ultimate findings and conclusions of law." *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002). "[O]ur duty is to make an independent determination of the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

a. *The exit order.* First, the officer was justified in ordering the defendant to exit the car. Where the police are justified in stopping an automobile for a routine traffic violation, they may order the driver or the passengers to leave the automobile if the officers "have a reasonable belief that [their] safety, or the safety of others, is in danger." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 663 (1999). See *Commonwealth* v. *Bostock*, 450 Mass. 616, 619-620 (2008), and cases cited. "While a mere hunch is not enough, see *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974), it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." *Gonsalves, supra* at 664. "To justify . . . the order to the occupants to exit the automobile, 'we ask "whether a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger." ' " *Commonwealth* v. *Santos*, 65 Mass. App. Ct. 122, 124-125 (2005), quoting from *Commonwealth* v. *Vazquez*, 426 Mass. 99, 102-103 (1997), quoting from *Commonwealth* v. *Santana*, 420 Mass. 205, 212-213 (1995). "Police are entitled to take reasonable precautions for their safety when approaching a stopped vehicle, and may order the occupants to leave the vehicle [and] pat frisk them." *Commonwealth* v. *Ancrum*, 65 Mass. App. Ct. 647, 655 (2006).

Here, the officer noticed that the defendant, seated in the passenger seat, was nervously shaking and was sitting on his left

---

the defendant's pants — in the pocket of shorts, which the defendant was wearing under his pants.

"The driver was given a verbal warning and allowed to leave the scene. The defendant was placed under arrest and charged accordingly.

"I find that the stop was proper and that Det. Guillermo properly requested identification and that the defendant's behavior created reasonable concern for his safety. I, therefore, deny the defendant's Motion to Suppress."

hand. He was unable to produce identification, and, when asked if he had any weapons, he failed to answer the officer and turned his head away. See *Commonwealth* v. *Stampley*, 437 Mass. 323, 328 (2002) ("justification for an exit order does not depend on the presence of an 'immediate threat' . . . , but rather on the safety concerns raised by the entire circumstances of the encounter"); *Commonwealth* v. *Goewey*, 452 Mass. 399, 407 (2008) (defendant passenger's production of expired identification with a questionable photograph, nervousness, and what appeared to be furtive movements justified exit order).

b. *The patfrisk of the defendant.* The patfrisk of the defendant was likewise proper. "The standard for a patfrisk is the same as the standard required to justify an order to the occupants of a vehicle stopped for traffic violations to leave the vehicle." *Commonwealth* v. *Torres*, 433 Mass. 669, 676 (2001). The same evidence that justified the exit order also supported the patfrisk of the defendant. See *Commonwealth* v. *Horton*, 63 Mass. App. Ct. 571, 575-576 (2005), and cases cited (exit order justified by unusual movements of vehicle's occupants, combined with the fact that the stop occurred late at night in a high crime area). Therefore, the patfrisk and the subsequent seizure of narcotics were lawful; consequently, the judge's denial of the motion to suppress was proper.[13]

*Judgments reversed.*

*Verdicts set aside.*

---

[13]The defendant appears not to challenge the officer's seizure of the cocaine as beyond the proper scope of a patfrisk; in any event, such a challenge would have been futile given the officer's testimony, credited by the motion judge, that he knew immediately upon touch that it was narcotics. See *Commonwealth* v. *Wilson*, 441 Mass. 390, 396-397 (2004).