Commonwealth *vs.* Jack Westbrooks.

No. 09-P-1901.

Middlesex. December 14, 2010. - May 5, 2011.

Present: Mills, Grainger, & Fecteau, JJ.

*Controlled Substances. Evidence,* Certificate of drug analysis. *Practice, Criminal,* Confrontation of witnesses. *Constitutional Law,* Confrontation of witnesses. *Error, Harmless. Search and Seizure,* Affidavit, Warrant. *Probable Cause.*

At the trial of indictments charging violations of the controlled substances act, the admission in evidence of certificates of chemical analysis in the absence of testimony from the analyst, in violation of the defendant's constitutional right to confront witnesses, was harmless beyond a reasonable doubt, where the defendant's statements and actions during a search of his residence were implicit admissions that the substances in question were, in fact, cocaine, Percocet, and marijuana; where the defendant in his testimony at trial identified the substances found in his possession and described a long history of use of them; and where the defendant was not motivated to testify because of the admission of the certificates, but rather to explain the large number of Percocet pills seized. [421-426]

A Superior Court judge properly denied the criminal defendant's pretrial motion to suppress evidence obtained from the execution of a warrant to search his residence, where the affidavit accompanying the application for the warrant provided sufficient evidence of a nexus between the defendant's drug transactions and the residence. [426-429]

Indictments found and returned in the Superior Court Department on July 26, 2007.

A pretrial motion to suppress evidence was heard by *John T. Lu,* J., and the cases were tried before *Hiller B. Zobel,* J.

*Scott A. Katz* for the defendant.

*Kristen MacIsaac,* Assistant District Attorney, for the Commonwealth.

Fecteau, J. The defendant, Jack Westbrooks, appeals from convictions of four violations of the controlled substances act

after a jury trial in Superior Court.[1] Specifically, the defendant first complains that the admission of certificates of chemical analysis in the absence of testimony from the analyst violated his confrontation rights and was harmful error. While admission of the certificates was error, it was harmless beyond a reasonable doubt. Second, the defendant contends that the motion judge (who was not the trial judge) erred in denying the defendant's motion to suppress the evidence obtained from the execution of a search warrant. On our review of the warrant application, there was probable cause for the issuance of the search warrant for this location, and we affirm the judge's decision to deny the motion. Therefore, we affirm the convictions.

*Background.*[2] At about 2:45 P.M. on August 25, 2006, members of the Everett police department (including Detectives Kelley and Connor) arrived at the basement door at 9 Belmont Street in Everett to execute a search warrant. After the officers knocked on the door to the basement, the defendant answered it and the officers entered. One of the officers explained to the defendant that the officers were there to execute a search warrant. The defendant "was fine; he was cooperative." The officers explained the warrant and read the defendant his Miranda rights.

The defendant asked the officers not to ransack his apartment and agreed to give the police the items he thought they were looking for, whereupon he began to retrieve a number of Ziploc bags containing different substances and handed them to Detective Kelley. First, he retrieved a Ziploc bag from a kitchen cabinet that contained a "green leafy substance," which Detective Kelley "believed to be marijuana." The defendant then retrieved a second Ziploc bag of marijuana from a kitchen drawer. Next, the defendant retrieved what Kelley said were "three bags of cocaine, and then two additional bags with pills" from a small vest on the couch. One of the bags had seventy-two pills, and the other had thirty-eight pills.

---

[1]The defendant was charged with trafficking in oxycodone and possession with intent to distribute cocaine, marijuana, and buprenorphine; however, the jury found him guilty of the lesser included offense of simple possession of the particular controlled substance alleged in each indictment.

[2]We reserve a recitation of facts pertinent to the warrant application to the discussion of that issue below.

The officers searched for additional drugs. Detective Connor found two small bags of a "white powdery substance" that he believed to be cocaine and a "small bag of a green leafy substance" he believed to be marijuana in the top drawer of a bureau next to the bed. In the third drawer down from the top of the same bureau he also located a bag of ten blue Percocet pills. These blue pills, which were admitted in evidence, had the word "PERCOCET" stamped on them on one side. In the same drawer, he found fifteen white Percocet pills. Detective Connor also located two bags of white Percocets in a drawer inside the stove, one bag containing 179 pills and the other containing eighty-eight pills. At the coffee table, Detective Connor discovered another "small bag of green leafy substance," which he believed at the time to be marijuana.

Sergeant Durant found ten orange suboxone pills during the search and gave them to Detective Kelley. Based on Detective Kelley's training and experience, he recognized buprenorphine as another name for suboxone. During the search, Detective Kelley also received marijuana from both Sergeant Durant and Sergeant O'Malley. Officers also seized several additional bags containing various substances.

At trial, a certificate of drug analysis was entered in evidence with each controlled substance and identified by Detective Kelley. The defendant turned over $286 during the search to Detective Kelley, which was entered in evidence. There was no drug paraphernalia found in the apartment other than the above evidence. The Commonwealth's police witnesses conceded on cross-examination the lack of evidence indicative of drug distribution, such as scales, dilutant, grinders, baggies or packaging materials, ledgers, a safe or other security items, and weapons.

The defense was that the seized drugs were for personal use, not distribution. In support of this defense, the defendant testified to a lengthy history of drug use, dating from about 1990, when he got run over by a truck; as a result of his injuries, he was prescribed and began taking Percocet. Thereafter and for the interceding twenty years, the defendant was given Percocet pills, other than by prescription, by others, including coworkers and work customers, and testified to using up to thirty Percocets a day.

The defendant admitted to keeping Percocet "[a]ll over" his apartment, keeping Percocet pills in his pocket at work, and hiding his "per[c]s" from most people. He testified that he was taking them "constantly," having to "eat five, ten at times," to get out of bed in the morning, taking another twenty Percocets in the afternoon and night. The defendant introduced three medical records in evidence to demonstrate his Percocet addiction.

When asked why some of the pills were blue and some white, the defendant explained, "That's just how they come." He continued, "I just know — 'Percs' — I look at the thing, and if it says 'Perc' on it, or something." He added, "I don't care about the color, as long as they're 'Percs.'" When asked if he kept Percocets in his stove, the defendant said, "Yes." He also confirmed that he had one bag containing 179 Percocets and another bag containing approximately eighty-eight Percocets. He also stated that along with taking six to seven Percocets in the morning before he got out of bed, "instead of coffee [he'd] have a joint."

Regarding the cocaine, the defendant testified on direct examination that he used cocaine once a year at an annual party on Labor Day weekend. According to the defendant, he had purchased the supposed cocaine found in his apartment from a "kid from Chelsea" but had never used any of the three bags he had recently purchased (and was unclear whether he had used any of the alleged cocaine contained in two smaller bags discovered by the police). The defendant saved up "all year long" for cocaine and then obtained it from "a friend of [his] that [he] know[s] very well." The defendant received a discount because the "kid is a pretty good friend of [his]," and the defendant "did it once a year with him for years." The defendant stated that the other two bags found in his apartment were from the previous year when he "went and did the same thing." The defendant stated that he "[d]idn't look and see what it was. Didn't know anything," when he purchased the cocaine. Then, in response to the question whether there were three bags of cocaine that he delivered to the police, he responded, "That was, yes." On cross-examination, the defendant confirmed that he was "caught with" "three eight balls" of cocaine, and when asked if he saw the "bags of cocaine introduced in evidence," the defendant responded, "Yes."

The defendant was also indicted for possession of buprenorphine. Detective Kelley testified that he recognized buprenorphine as another name for suboxone. The defendant said his friend gave him the suboxone pills to help him combat his opiate addiction because the defendant was taking thirty "Percs" a day. The defendant "knew what they were" and had never taken any but was saving them "until [he] was ready."

*Discussion. Certificates of drug analysis.* The United States Supreme Court has held that the admission of the certificate from the forensic chemist without an opportunity for cross-examination is error. See *Melendez-Diaz* v. *Massachusetts,* 129 S. Ct. 2527 (2009). The defendant is entitled to a review under harmless error principles. *Commonwealth* v. *Vasquez,* 456 Mass. 350, 355-360 (2010). In determining whether the error was harmless, we ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Commonwealth* v. *Perez,* 411 Mass. 249, 260 (1991), quoting from *Chapman* v. *California,* 386 U.S. 18, 24 (1967).

In making an assessment of harmless/harmful error, the court must consider whether, "on the totality of the record before [it], weighing the properly and improperly admitted evidence together, [the court is] satisfied beyond a reasonable doubt that the [certificates] did not have an effect on the jury and did not contribute to the jury's verdicts." *Commonwealth* v. *Tyree,* 455 Mass. 676, 701 (2010). "[A] number of factors [may be examined], including the importance of the evidence in the prosecution's case, the frequency of reference to the evidence, whether it was cumulative of other evidence, and whether the other evidence against the defendant was overwhelming." *Commonwealth* v. *Pimentel,* 76 Mass. App. Ct. 236, 238 (2010), quoting from *Commonwealth* v. *Rosario,* 430 Mass. 505, 511 (1999). Also considered is "the relationship between the evidence and the premise of the defense." *Ibid.,* quoting from *Commonwealth* v. *Mahdi,* 388 Mass. 679, 696-697 (1983).

The defendant contends that there was inadequate evidence, independent from the certificates of chemical analysis, showing the nature of the substances for which he was charged and that his testimony ought not to be considered on this issue. As to this latter point, he contends that the harmless error analysis

should not give much weight to his testimony because he did not stipulate to the nature of the substances seized by police. See *Melendez-Diaz, supra* at 2542 (defendant "will often stipulate to the nature of the substance in the ordinary drug case"); *Commonwealth* v. *Muniz*, 456 Mass. 166, 173 n.7 (2010); *Commonwealth* v. *Vasquez*, 456 Mass. at 355 ("The defendant, however, did not stipulate that the substances were cocaine"); *Commonwealth* v. *Charles*, 456 Mass. 378, 383 (2010) (rejecting the Commonwealth's argument that reversal is not required where the nature of the substances was not a " 'live issue' at trial" because "the defendant 'tacitly stipulated' to the nature of the substances" when defense counsel referred "to the substances as 'drugs' in his opening statement," and when "in questioning witnesses and in his summation, [counsel] referred to the substances as 'marijuana' and 'crack cocaine,' " and when counsel "encouraged the jury to return verdicts of guilty on the lesser included offenses of simple possession"); *Commonwealth* v. *Rivera*, 76 Mass. App. Ct. 67, 71-72 (2009). The defendant also argues that his testimony did not waive his confrontation rights that he had preserved by objection because he was compelled to present the personal use defense in light of the statutorily permitted and virtually certain introduction of the certificates. We disagree.

As to the nature of the substances, we have recognized that "it would be a rare case in which a witness's statement that a particular substance looked like a controlled substance would alone be sufficient to support a conviction." *Commonwealth* v. *Hernandez*, 77 Mass. App. Ct. 259, 263 (2010), quoting from *Commonwealth* v. *Dawson*, 399 Mass. 465, 467 (1987). It is also "settled that scientific analysis is not the only method to prove the nature of a substance, and that a properly qualified police officer may provide opinion testimony that a substance is a particular controlled substance." *Ibid.* Had the evidence in this case consisted only of the testimony of police officers who "believed" that the substances were Percocet, cocaine, marijuana, and suboxone, and considering the authorities upon which he relies, there would be force to the defendant's arguments. Here, however, powerful evidence of the nature of the substances was introduced, consisting of admissions made by the defendant during the search by police and during his trial testimony.

Competent evidence of the nature of a controlled substance can come from drug users, such as a defendant. Furthermore, "a witness need not have used the substance on the occasion in question in order to testify as to its nature. It is enough that the witness have familiarity based on prior use or sale. . . . 'Identification based on past use coupled with present observation of the substance at hand will suffice to establish the illicit nature of a suspected substance.' " *Commonwealth* v. *Cantres*, 405 Mass. 238, 246-247 (1989), quoting from *United States* v. *Harrell*, 737 F.2d 971, 978-979 (11th Cir. 1984), cert. denied, 469 U.S. 1164, and 470 U.S. 1027 (1985). See *Commonwealth* v. *Villatoro*, 76 Mass. App. Ct. 645, 652-654 (2010) (judge entitled to infer that defendant in that case, who testified to long history of marijuana use, was able to identify marijuana and competent to testify on subject).

Here, the defendant's statements and actions during the search of his residence were, at the least, implicit admissions that the substances in question were, in fact, cocaine, Percocet, and marijuana. The Commonwealth introduced evidence during its case-in-chief that police officers explained the search warrant to the defendant. The defendant told them he would hand over "what they were looking for" in return for the police not ransacking his residence; he then proceeded to retrieve Ziploc bags from the kitchen containing marijuana and cocaine, and multiple bags of Percocet containing approximately thirty to seventy pills in each bag. The officers also located other items that they believed to be Percocet pills, cocaine, marijuana, and buprenorphine. In *Commonwealth* v. *DeMatos*, 77 Mass. App. Ct. 727, 732 (2010), the Commonwealth introduced admissions from the defendant that he was "a substantial user of cocaine, . . . that he was using cocaine in his apartment at the time the police arrived, and [that] when shown the drugs found in the apartment, [he] acknowledged that he had forgotten that cocaine was there." The court concluded that "the evidence that the composition of the drugs in the apartment was cocaine was so powerful that the certificates had little or no effect on the verdicts." *Ibid.*

In addition, consistent with the opening statement of his attorney at the beginning of the trial,[3] the defendant gave extensive

---

[3] "[The defendant], you'll hear, has hopelessly been addicted to Percoset

testimony during which he identified the substances found in his possession and described a long history of use of the substances in question. He admitted that he had been addicted to Percocet for many years, dating from a work-related accident in 1990, and that he consumed up to thirty pills per day; additionally, he admitted frequent and long-standing use of marijuana and annual purchase and consumption of cocaine. Then, during the prosecutor's cross-examination of the defendant, following up on the Commonwealth's evidence of the manner in which the defendant retrieved and turned over bags of drugs, he identified the bags containing in excess of 100 pills as Percocets, and admitted that he had secreted Percocets all over his house, including in his stove, and that he knew Percocets. Moreover, he admitted being "caught with" "three eight balls" of cocaine.

This testimony is significantly similar to that given in *Commonwealth* v. *Villatoro*, 76 Mass. App. Ct. at 652-654, wherein the defendant "not only admitted that the substance in question was marijuana, he testified at length on the subject, asserting the distinction between different grades of 'weed,' explaining why he also had smoking implements and baggies on his person, and detailing his experience and long history of marijuana use." Moreover, as in *Villatoro*, and unlike the recent case of *Commonwealth* v. *Mendes*, 78 Mass. App. Ct. 474, 478-482 (2010), further appellate review granted, 459 Mass. 1104 (2011), the defendant's testimony was directed toward the nature of the substances for which he was charged.[4]

---

[sic] for many years, he uses marijuana, and occasionally cocaine. You're going to hear about how the marijuana and the Percoset [sic] accumulated in [the defendant's] apartment, how they were acquired, why they were acquired. You're going to be able to see those substances for yourself. And you'll see the amount, the way they were packaged, et cetera."

[4]Our decision in *Commonwealth* v. *Mendes, supra,* is inapposite; there, we held that the defendants' testimony should not be considered in light of the Supreme Court's decision in *Melendez-Diaz.* In *Mendes, supra* at 380, similar to the case at bar, the defendants contended that the drugs were not for distribution but for personal use, but we determined that it was inappropriate to consider the defendants' testimony because the Commonwealth was not relieved, in its case-in-chief, of proving that the substances in question were drugs, "short of a stipulation as to the nature of the drugs." See *Commonwealth* v. *Vasquez,* 456 Mass. at 367; *Commonwealth* v. *Charles,* 456 Mass. at 383. We also determined this result was fair because it was virtually impossible to discern if the defendants' motivation to testify was independent of the erroneous

Unlike *Mendes, supra,* we have no doubt here that the defendant was not motivated to testify because of the admission of the certificates of drug analysis. Rather, we are confident that he testified because he needed to explain the large number of Percocet pills that the police seized, including many handed over by the defendant himself. Unless he testified, any justification for his possession of the drugs for his personal use, especially due to his Percocet addiction, would have been unknown to the jury. Moreover, we can discount the possibility that admission of the certificates provided any motivation for the defendant to testify as he would have been aware of the evidentiary impact of his own admissions to the police during the search. Contrast *Mendes, supra* at 476 (one defendant made no admissions during the execution of the search warrant, and the other only admitted to " 'some trees' — street slang for marijuana"). Moreover, unlike the currency that should have been suppressed in *Commonwealth* v. *Charros,* 443 Mass. 752, 765-767, cert. denied, 546 U.S. 870 (2005), the controlled substances here are not being suppressed; the issue is the quantity and quality of evidence of the nature of the substances apart from the certificates. In our view, because the defendant's testimony explained his possession of the drugs for which he was charged and his familiarity with the drugs at issue, and because he admitted the nature of the substances found by police, this case is different from *Commonwealth* v. *Mendes, supra,* and is instead controlled in significant measure by *Villatoro, supra,* and *DeMatos,* 77 Mass. App. Ct. at 730-732.

We acknowledge that in analyzing for harmless error, a defendant's failure to contest the nature of the substance should not be considered as controlling. See *Commonwealth* v. *Vasquez,* 456 Mass. at 355 (defendant's theory of defense, as explained by trial counsel's summation, was mistaken identity). We believe that there is a significant difference between a situation where

admission of the certificates of drug analysis, relying upon *Commonwealth* v. *Charros,* 443 Mass. 752, cert. denied, 546 U.S. 870 (2005). In *Charros,* the court noted the "Catch-22" position in which the defendant found herself, having to explain her possession of currency that the court concluded should have been suppressed. *Id.* at 766. See *Mendes, supra* at 481 ("we cannot know whether the defendants' testimony was a response to the erroneous admission of the certificates and hence tainted by the error"). Here, as we explain below, the situation is different.

the defendant does not contest the nature of a substance and one where the defendant admits to the police the nature of a substance, confirms it during his testimony, and advances the theory of personal use by more than cross-examination and final argument. Here, that theory, which was announced in his attorney's opening statement, was powerfully advanced by his own testimony and finally summarized by his attorney in the closing statement: "the Commonwealth has failed to meet their burden with respect to one and one element alone, and that is that there is no intent to distribute by [the defendant]."[5]

We are thus convinced that the certificates' admission in evidence was harmless beyond a reasonable doubt. The Commonwealth showed that other properly admitted "evidence of guilt was 'overwhelming' in the sense that it was so powerful as to 'nullify any effect' " that the improperly admitted evidence "might have had on the jury or the verdict." *Commonwealth* v. *Tyree*, 455 Mass. at 704 n.44, quoting from *Commonwealth* v. *Dagraca*, 447 Mass. 546, 555 (2006). See *Commonwealth* v. *Vasquez*, *supra* at 363. Thus, reversal is not required.

*Search warrant.* The affidavit in support of the application for a search warrant from Everett police Detective Kelley provided the magistrate with information that an Everett police officer living next door to 9 Belmont Street had observed frequent foot traffic coming and going from the basement apartment of 9 Belmont Street. In the span of a few hours, the officer "notic[ed] the occupant [of 9 Belmont Street] [i.e., the defendant] would come out of the house talking on a [cellular telephone] several times." Detective Kelley corroborated these observations on August 8 and 9, 2006, witnessing a number of people make short visits to 9 Belmont Street. Prior to the visits, the defendant was seen in front of 9 Belmont Street looking around and talking on a cellular telephone. In addition, the affidavit reported that a confidential informant known to Kelley and dubbed "Spider" told Kelley that the defendant was distributing Percocet out of 9 Belmont Street, that he had purchased Percocet from the defendant in the past, and that he "ha[d] seen over 100 pills in [the defendant's] possession wrapped in a paper towel or in a zip

---

[5] It should also be noted that the Commonwealth did not rely upon the certificates during final argument.

lock freezer bag." The affidavit then described three controlled purchases of Percocets by Spider supervised by police from the defendant at the location in question[6] — two during the week of August 13, 2006, and one within seventy-two hours of Detective Kelley's August 21, 2006, warrant application.[7] Lastly, the affidavit indicated that on another occasion, a uniformed officer knocked on the basement door of 9 Belmont Street, which was opened by the defendant.

The defendant complains that the search warrant application was insufficient to establish reasonable belief that evidence of drug dealing would be located in the targeted apartment since the affidavit did not show evidence of the required nexus between criminal activity and the location sought to be searched. In particular, the defendant contends that sufficient evidence of a nexus was lacking because the warrant affidavit does not contain any description of the interior of 9 Belmont Street, including how many units are in the building, nor does it contain any "description of the means of access or egress between the units in the building." Likewise, the affidavit does not contain any description of Spider's supposed activities inside 9 Belmont Street, i.e., where he went, what he did, or who (if anyone) he met with while inside the building, nor does it contain any allegation that Spider ever saw Percocets (or any other controlled substance) inside the defendant's basement apartment.[8]

---

[6]The affidavit also stated that Spider identified the defendant from a surveillance photograph of the defendant that was taken outside 9 Belmont Street.

[7]The affidavit further described how the police followed the protocol established for controlled purchases to eliminate the possibility that the confidential informant had secreted the controlled substance or money on his person or vehicle. Kelley "provided 'Spider' with an undisclosed amount of US Currency and [other officers] established surveillance position prior to contact with the [defendant]." Kelley "directed 'Spider' to place a telephone call to [the defendant], for the purpose of buying Percocet. 'Spider' used [a specified number] to contact [the defendant]. [Detective Kelley] followed 'Spider' to 9 Belmont St. [An officer] observed as 'Spider' entered the basement door of 9 Belmont St. After several minutes 'Spider' exited the apartment. 'Spider' then left the area and was followed back to a prearranged area by [Detective Kelley]. While at the prearranged area [Detective Kelley] retrieved the controlled purchase of an undisclosed amount of Percocet pills and conducted a search of 'Spider' for any other contraband. [Detective Kelley] also conducted a search of 'Spider['s]' vehicle. These searches were met with a negative result."

[8]The defendant also complains that the informant fails to pass both prongs

"Our inquiry into the sufficiency of a search warrant application always begins and ends with the 'four corners of the affidavit.' " *Commonwealth* v. *O'Day,* 440 Mass. 296, 297 (2003), quoting from *Commonwealth* v. *Villella,* 39 Mass. App. Ct. 426, 428 (1995). See *Commonwealth* v. *Pina,* 71 Mass. App. Ct. 653, 654 (2008).

"The substance of all definitions of probable cause is reasonable ground for belief." *Commonwealth* v. *Vynorius,* 369 Mass. 17, 23 (1975), quoting from *Commonwealth* v. *Stewart,* 358 Mass. 747, 749 (1971). We must consider the affidavit in its entirety "and not by first dissecting it and then subjecting each resulting fragment to a hypertechnical test of its sufficiency standing alone." *Stewart, supra* at 751. Moreover, given a strong preference for the "informed and deliberate determinations of magistrates," *United States* v. *Lefkowitz,* 285 U.S. 452, 464 (1932), courts reviewing warrants "will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.' " *Aguilar* v. *Texas,* 378 U.S. 108, 111, quoting from *Jones* v. *United States,* 362 U.S. 257, 270 (1960).

"[T]he information in the affidavit must be adequate to establish a timely nexus between the defendant and the location to be searched and to permit the determination that the particular items of criminal activity sought reasonably could be expected to be found there." *Pina, supra* at 655, quoting from *Commonwealth* v. *Luthy,* 69 Mass. App. Ct. 102, 105 (2007). See *Commonwealth* v. *Gallagher,* 68 Mass. App. Ct. 56, 59 (2007).

While the search warrant affidavit was not a model of detail and clarity, as a whole it provides sufficient evidence that there was a nexus between the drug transactions and the basement apartment at 9 Belmont Street. See *Commonwealth* v. *O'Day,* 440 Mass. at 300-305. The affidavit reported that there were three controlled purchases, all of which the informant set up by calling a specified number. On all three occasions, the informant was told to go to the basement apartment. While the affiant

of the *Aguilar-Spinelli* test. See *Aguilar* v. *Texas,* 378 U.S. 108 (1964); *Spinelli* v. *United States,* 393 U.S. 410 (1969); *Commonwealth* v. *Cast,* 407 Mass. 891, 896 (1990). Even assuming that is true, the controlled purchases here provide sufficient corroboration of the informant to satisfactorily support both prongs. See *Commonwealth* v. *Warren,* 418 Mass. 86, 89 (1994).

could not constantly watch the informant after he entered the building, the affiant states that he saw the informant go in and leave by the basement door.

In addition, the defendant argues that there was no conclusive evidence that the drug transactions occurred within the target apartment. However, the fact that neither the informant's statement nor police observations established that the drug transactions occurred within the apartment does not alter the probable cause analysis. See *Commonwealth* v. *Hardy*, 63 Mass. App. Ct. 210, 213 (2005). While the affidavit did not negate the possibility that the purchases occurred somewhere inside the building and not necessarily within the apartment, it is reasonable to conclude that the transactions occurred within the apartment or, at the least, that evidence of or from the transactions would be located there. See *Commonwealth* v. *Santiago*, 66 Mass. App. Ct. 515, 522 (2006); *Commonwealth* v. *Turner*, 71 Mass. App. Ct. 665, 669-670 (2008). Further, the additional facts of three controlled purchases, the method used by the informant to contact the defendant, the surveillance, and the reasonable inferences drawn from those facts tip the balance in favor of the Commonwealth. Contrast *Commonwealth* v. *Olivares*, 30 Mass. App. Ct. 596, 600-601 (1991); *Commonwealth* v. *Smith*, 57 Mass. App. Ct. 907, 908-909 (2003). In our view, the affidavit sufficiently established the required nexus, and the defendant's motion to suppress was correctly denied. See *Luthy*, *supra* at 105-109.

*Judgments affirmed.*