COMMONWEALTH *vs.* RONALD MENDES
(and six companion cases[1]).

Middlesex. May 7, 2012. - September 5, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Controlled Substances. Evidence,* Certificate of drug analysis, Hearsay. *Constitutional Law,* Confrontation of witnesses, Harmless error, Probable cause. *Practice, Criminal,* Confrontation of witnesses, Harmless error, Warrant, Affidavit, Hearsay. *Error, Harmless. Search and Seizure,* Warrant, Affidavit, Probable cause. *Probable Cause.*

At the trial of criminal complaints charging the defendants with, inter alia, possession of cocaine with intent to distribute and possession of marijuana with intent to distribute, the erroneous admission in evidence of certificates of drug analysis without the testimony of the analyst who prepared them, in violation of the defendants' constitutional right to confront witnesses against them, was harmless beyond a reasonable doubt, where, on the totality of the record, this court was satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts, in that, in addition to the circumstantial evidence presented in the Commonwealth's case regarding the chemical composition of each substance, each defendant testified that the substances seized by police in his room were cocaine and marijuana, and the defendants' testimony was offered not to rebut or explain the contents of the improperly admitted certificates (the accuracy of which was never contested), but to rebut the extensive evidence of distribution. [358-364]

The affidavit accompanying an application for a search warrant was sufficient to support a clerk-magistrate's determination of probable cause, where, in the affidavit, the level of detail found in two informants' descriptions of the defendants' drug distribution operation was consistent with firsthand knowledge through personal observation; where one informant's reliability was established through previous instances where the informant's information led to the confiscation of illegal narcotics, and where the second informant's reliability was corroborated by, inter alia, the first informant's controlled purchases; and where a sufficient nexus existed between the crime and the defendants' shared residence, based on police observations of each defendant leaving the residence and traveling directly to a prearranged location to sell cocaine to one of the informants, together with the informants' information. [364-366]

At the trial of criminal complaints charging the defendants with, inter alia, possession of cocaine with intent to distribute and possession of marijuana

[1]Two against Ronald Mendes and four against Raymond B. Mendes.

with intent to distribute, no error occurred in the admission in evidence of a police officer's testimony regarding statements made to him during telephone calls received on two cellular telephones that he seized during the execution of a search warrant, where the statements were not offered for their truth but rather to show possession of an instrumentality of the drug trade; further, because the statements were admitted for a nonhearsay reason, the admission of the statements did not violate the defendants' constitutional right to confront witnesses against them; finally, no substantial risk of a miscarriage of justice arose from the lack of a limiting instruction regarding the statements. [366-369]

COMPLAINTS received and sworn to in the Somerville Division of the District Court Department on October 24, 2006.

Pretrial motions to suppress evidence were heard by *Sabita Singh*, J., and the cases were tried before *James L. LaMothe, Jr.*, J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kevin J. Curtin*, Assistant District Attorney (*James J. Mulcahy*, Assistant District Attorney, with him) for the Commonwealth.

*Valerie A. DePalma* for Ronald Mendes.

*Pamela Symmes Segre* for Raymond B. Mendes.

CORDY, J. In March, 2008, after a jury trial in the District Court, the defendants, brothers Ronald and Raymond B. Mendes,[2] were convicted of several violations of the controlled substances laws, including the possession of class B and class D substances (cocaine and marijuana, respectively) with intent to distribute.[3] On appeal, they primarily claim that the admission of certificates of drug analysis (drug certificates) to prove

---

[2]Because the defendants share the same surname, we will refer to them by their first names.

[3]Both Ronald and Raymond were convicted of possession of a class B substance (cocaine) with intent to distribute, G. L. c. 94C, § 32A (*a*); possession of a class D substance (marijuana) with intent to distribute, G. L. c. 94C, § 32C (*a*); and corresponding school or park zone violations, G. L. c. 94C, § 32J. Raymond was also convicted of possession of a class B substance ("Ecstasy"), G. L. c. 94C, § 34. The convictions of possession of marijuana with intent to distribute and Raymond's conviction of possession of Ecstasy were placed on file. We consider the appeals from the convictions that were placed on file, because they present issues identical to those raised by the convictions from which appeal was taken. See *Commonwealth* v. *Spearin*, 446 Mass. 599, 606 (2006) (court may consider such appeals, "in our discretion,

the chemical composition of the drugs seized in their shared apartment, a practice subsequently declared unconstitutional by *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305 (2009) (*Melendez-Diaz*), was constitutional error that was not harmless beyond a reasonable doubt. They also argue that the search warrant affidavit failed to establish a nexus between alleged drug dealing and their apartment, and that the admission in evidence of police testimony recounting requests by third parties to purchase drugs from the defendants violated their constitutional right of confrontation.[4]

A divided panel of the Appeals Court reversed the convictions based on the improperly admitted drug certificates, even though the defendants both testified at trial and admitted that they possessed the drugs, but for personal use. *Commonwealth* v. *Mendes*, 78 Mass. App. Ct. 474, 484 (2010). The court reasoned that the defendants' testimony could not be considered when evaluating whether the admission of the drug certificates was harmless beyond a reasonable doubt, because the erroneous admission tainted the defendants' entire testimony and it would have been impossible to determine whether or how the defendants would have testified had the certificates not been admitted. *Id.* at 480-482. The dissenting Justice reasoned that the entire trial record must be considered, and concluded that the defendants' testimony provided "powerful substantive evidence" that the substances were in fact the drugs the Commonwealth alleged them to be, which, in conjunction with testimony by the Commonwealth's witnesses, nullified any effect that the certificates may have had on the jury. *Id.* at 484-491 (Berry, J., dissenting in part). We granted the Commonwealth's application for further appellate review, and now affirm the convictions.

1. *Background.* a. *The Commonwealth's case.* On the morning of October 21, 2006, Somerville police Detective James Hyde and other police officers executed a search warrant at the defendants' apartment, located in Somerville, directly across the

in a suitable case"). Prior to trial, conspiracy charges against both defendants were dismissed at the Commonwealth's request.

[4]Before the Appeals Court, the defendants also argued that the opinion testimony by the Commonwealth's expert on intent to distribute exceeded appropriate bounds. See *Commonwealth* v. *Mendes*, 78 Mass. App. Ct. 474, 483 (2010). This argument was not raised before this court and is deemed waived.

street from a playground. The police provided the defendants with a copy of the search warrant and advised them of their Miranda rights. The defendants initially denied that any drugs were in the apartment, but Raymond later admitted that there were "some trees" — slang for marijuana — in his bedroom.

At trial, Detective Hyde and Detective Dominic Pefine, another member of the search team, testified regarding the evidence recovered in the apartment. In Ronald's bedroom the officers seized a bag containing 1.46 grams of cocaine on the bureau, twelve bags of marijuana located in a shirt pocket, $943 in his closet, $158 on top of a television set, and a cellular telephone. In Raymond's bedroom, the officers seized a clear plastic bag containing .46 grams of cocaine and two tablets of methylene-dioxy methamphetamine, also known as "MDMA" or "Ecstasy," in a vase on top of his dresser; $240 in one dresser drawer and $500 in another drawer; a cardboard box under his bed containing a bag of marijuana, $420, and a one-hundred-gram weight associated with a triple-beam scale; and a cellular telephone. During a search of the living room, two additional bags of marijuana were found in Ronald's brown leather jacket. For each drug, Hyde identified the substance generically as "what appears to be a herbal residue," "a white powder substance," or "orange tablets," and then read a corresponding certificate of analysis identifying the substance as cocaine, marijuana, or Ecstasy.

In the kitchen, police seized some personal papers of the defendants, two notebooks, a clear plastic bag with one of the corners cut off, and three additional cellular telephones. On the front of one of the notebooks was written the phrase, "write down people that owe money." Both notebooks contained lists of names with dollar amounts.

The police conducted a second sweep of the apartment with a drug detection canine. The canine reacted to all the locations in which the police had previously found drugs. Neither sweep revealed paraphernalia associated with personal use of drugs.

While executing the search warrant, Detective Hyde monitored the cellular telephones. The telephones received ten to twelve calls over the course of the morning. The callers asked to speak to "Ray or Ron," and alluded to purchasing drugs. Detective

Hyde testified in detail about two conversations, in which he directed the would-be purchasers to a particular location, sent a marked cruiser to that location, and arranged for police to intercept them.

Detective Sergeant David Montana, the head of the Medford police department's drug control unit, testified as an expert witness for the Commonwealth. Among other things, he explained what cocaine and marijuana look like, the forms they may take, and how they are ingested or packaged for sale. Detective Sergeant Montana was shown some of the bags of drugs that were in evidence. He stated that he "believe[d]" that one substance in evidence was "about half a gram" of cocaine and that another substance "look[ed] like it's marijuana." In response to a hypothetical question, it was his opinion that the summary of the evidence put to him was not consistent with personal use.

b. *The defendants' case.* The theory of the defense was that the drugs found in the apartment were for personal use rather than distribution. Raymond called Dr. Alan Wartenberg, who testified regarding his extensive training and experience in addiction treatment and the consumption and purchasing habits of heavy drug users. Ronald called a friend who testified, among other things, that he would smoke marijuana with Ronald. In addition, each defendant testified in his own behalf.

Raymond testified that he kept large amounts of currency in the house because he did not have a bank account and his employer paid him "underneath the table." He explained that the records found by the police were for the purpose of keeping track of money that the defendants' friends had pledged to help buy music studio time for his son, an aspiring musician. With respect to his personal drug use, he testified that he bought one ounce of marijuana per week for about $180. He would then buy a "philly blunt" or a "roll-up," break it down, and fill it with marijuana laced with cocaine. Using a "roach clip," he typically smoked the blunt to the end. He kept this item in his "junk drawer" or closet. When asked by his attorney why he kept "the drugs" in the places where Detective Hyde testified he had found them, Raymond responded that he was hiding them from his children, who would visit on weekends. Raymond also testified that he and his brother would smoke marijuana

together. On cross-examination, he added that he would take Ecstasy pills as a "sex drug" when "a lady friend" came to visit.

Ronald testified that he smoked marijuana daily, sometimes three or four times per day, and purchased it twice per week from a dealer in the neighborhood playground. He smoked the marijuana using "blunts," "wraps," and rolling paper, which he kept in his wallet. He also used cocaine about three times per week. He would sprinkle the cocaine on his marijuana and smoke it. He admitted that he owned the two bags of marijuana found in the jacket in the living room and the twelve bags of marijuana found in the shirt in the bedroom, explaining that he had purchased marijuana for his personal use from a dealer who only sold it to him in "dime bags" because he had no bags with larger quantities at the time. He also admitted to owning the cocaine found in his bedroom.

2. *Certificates of drug analysis.* As the Commonwealth concedes, the submission in evidence of the drug certificates without the testimony of the analyst that prepared them violated the defendants' right of confrontation as guaranteed by the Sixth Amendment to the United States Constitution. See *Commonwealth* v. *Charles*, 456 Mass. 378, 381 (2010), citing *Melendez-Diaz* v. *Massachusetts*, 557 U.S. 305, 310-311 (2009). Although the defendants did not object at trial to the admission of the certificates on confrontation clause grounds, such an objection would have been futile at the time of the trial because of our decision in *Commonwealth* v. *Verde*, 444 Mass. 279 (2005), abrogated by *Melendez-Diaz* v. *Massachusetts*, *supra*. See *Commonwealth* v. *Vasquez*, 456 Mass. 350, 356-358 (2010). The objection is accordingly deemed preserved, and we must determine whether the error was harmless beyond a reasonable doubt. See *id.* at 360.

When analyzing whether an error was harmless beyond a reasonable doubt, "we ask whether, on the totality of the record before us, weighing the properly admitted and the improperly admitted evidence together, we are satisfied beyond a reasonable doubt that the tainted evidence did not have an effect on the jury and did not contribute to the jury's verdicts." *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). An error may

be deemed harmless beyond a reasonable doubt only when "other properly admitted evidence of guilt is 'overwhelming,' in the sense that it is 'so powerful as to "nullify any effect" ' that the improperly admitted evidence 'might have had' on the fact finder or the findings." *Commonwealth* v. *Vasquez, supra* at 362, quoting *Commonwealth* v. *Tyree, supra* at 704 n.44. In conducting this analysis, we examine various factors, including but not limited to "the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt." *Commonwealth* v. *Dagraca,* 447 Mass. 546, 553 (2006). A conviction is most susceptible to being overturned when "the over-all strength of the Commonwealth's case radiates from a core of tainted evidence." *Commonwealth* v. *Tyree, supra* at 701-702. In addition, "where the improperly admitted evidence directly implicates the Commonwealth's proof of an element of the crime, our inquiry must necessarily focus on the effect of the improperly admitted evidence as it pertains to that element." *Commonwealth* v. *Vasquez, supra.*

We must accordingly "consider whether the testimony . . . as to the chemical composition of each substance was so 'overwhelming' as to 'nullify any effect' the admission of the drug certificates might have had on establishing beyond a reasonable doubt . . . that the substances were 'cocaine' and ['marijuana']." *Id.* at 363. We first consider the evidence presented in the Commonwealth's case-in-chief. This evidence consisted of (1) Raymond's admission, reported by Detective Hyde, that he "ha[d] some trees in [his] bedroom"; (2) the method of packaging the drugs and other evidence of distribution; (3) Detective Hyde's testimony that a drug detection canine alerted to the presence of the drugs that had been seized by the police; (4) Detective Hyde's observations of the substances at the defendants' apartment and his commentary on the witness stand that they appeared to be cocaine and marijuana; and (5) the testimony of the Commonwealth's expert on intent to distribute, Detective

Sergeant Montana, that certain exhibits appeared to be marijuana or cocaine.

Even in combination, this evidence would not have nullified the effect of the admission of the drug certificates. Drug certificates "assure the fact finder, to a degree that virtually no amount of circumstantial evidence can, that the charged substance is in fact a particular illegal drug." *Commonwealth* v. *Vasquez*, *supra* at 363-364. By contrast, each of the statements presented during the Commonwealth's case lacked this degree of assurance. Raymond's admission that he had some "trees," without any context as to his personal experience, did not establish with certainty that the substances were marijuana. See *Commonwealth* v. *King*, 461 Mass. 354, 359-360 (2012) (controlled purchase of "rock" from defendant did not prove that substance was cocaine because substance could have been counterfeit; admission of certificates not harmless error). Likewise, neither the paraphernalia associated with the distribution of drugs nor the method of packaging of the substances established their chemical composition. See *Commonwealth* v. *Vasquez*, *supra* at 366-367 (scale, rubber bands, cash, sandwich bags, and walkie-talkie relevant on issue of distribution but not to establish that items were cocaine); *Commonwealth* v. *Charles*, *supra* at 382-383 (packaging of drugs in manner consistent with distribution insufficient to prove that substances were, in fact, cocaine and marijuana). Detective Hyde's testimony about the drug detection canine was brief, and there was no testimony that the canine distinguished between different narcotics. Cf. *Commonwealth* v. *Vasquez*, *supra* at 361 (proof of specific chemical composition of each drug is element of crime charged). Detective Hyde likewise did not articulate any expert basis for concluding that the substances were drugs and relied primarily on the drug certificates. See *Commonwealth* v. *Charles*, *supra* at 382; *Commonwealth* v. *Melendez-Diaz*, 76 Mass. App. Ct. 229, 233 (2010). Finally, Detective Sergeant Montana testified as an expert on the subject of distribution, not identification, and stated only that the substances appeared to be drugs. Such conclusory testimony cannot compensate for certificates that specifically identify the substances' chemical composition. See *Commonwealth* v. *MacDonald*, 459 Mass. 148, 154 (2011); *Commonwealth* v. *Vasquez*, *supra* at 365.

When reviewing a trial record for harmless error, however, we must take into account "the totality of the record before us." *Commonwealth* v. *Tyree, supra* at 701. Our review encompasses both the Commonwealth's and the defendant's case. *Commonwealth* v. *Howard,* 446 Mass. 563, 570 (2006) (admission of defendant's statement taken in violation of Sixth Amendment right to counsel was harmless error after considering entire record including evidence submitted in defense case). *Commonwealth* v. *Gilday,* 367 Mass. 474, 499 & n.4 (1975). We accordingly turn to the defendants' case.

Each defendant testified that the substances seized in his room were cocaine and marijuana. They explained at length how they would smoke the drugs, through the use of "roach clip[s]," "blunts," and "rolling papers." The defendants' testimony about their personal drug use established their credibility for identifying the substances in their possession as cocaine and marijuana. See *Commonwealth* v. *Dawson,* 399 Mass. 465, 467 (1987) ("great weight of authority in this country permits . . . an experienced user of a controlled substance to testify that a substance that he saw and used was a particular drug"). See also *Commonwealth* v. *Villatoro,* 76 Mass. App. Ct. 645, 652-654 (2010) (admission of drug certificates harmless beyond reasonable doubt where defendant admitted substance was marijuana and detailed his experience and long history of marijuana use).[5] Especially in combination with the circumstantial evidence presented in the Commonwealth's case, this testimony sufficed to render the admission of the drug certificates harmless beyond a reasonable doubt.[6]

The defendants argue, and the majority of the Appeals Court

[5]The defendants contend that their testimony did not overwhelm the erroneous admission of the drug certificates, because neither defendant specifically identified the substances seized as cocaine or marijuana. This argument elevates form over substance. Just after his testimony on his personal use of cocaine and marijuana in his home, Raymond explained that he would hide "the drugs" in the locations where they were found by the police in order to keep them away from his children. The only reasonable inference was that "the drugs" found by the police were the same cocaine and marijuana that he would habitually smoke. Moreover, Ronald explicitly admitted that he owned the marijuana found in his clothing and the cocaine found in his room.

[6]The factors for determining harmlessness beyond a reasonable doubt, as articulated in *Commonwealth* v. *Dagraca,* 447 Mass. 546, 553 (2006), support

panel concluded, that in this case we should depart from our general rule that we consider the effect of an error in the context of the totality of the record of the trial. *Commonwealth* v. *Tyree*, 455 Mass. 676, 701 (2010). They contend that the admission of the certificates potentially tainted the entirety of the defendants' testimony and that the defendants testified only after the certificates established that the substances were drugs, as "records of primary fact, with no judgment or discretion on the part of the analysts." *Commonwealth* v. *Vasquez*, *supra* at 363, quoting *Commonwealth* v. *Verde*, 444 Mass. 279, 282 (2005). According to defendants and the majority of the Appeals Court panel, it would be virtually impossible to say whether or how the defendants would have testified had the error not occurred. See *Commonwealth* v. *Mendes*, 78 Mass. App. Ct. 474, 480-481 (2010).

The defendants principally rely on *Commonwealth* v. *Charros*, 443 Mass. 752, cert. denied, 546 U.S. 870 (2005). In the *Charros* case, police improperly stopped a family in their vehicle while executing a search warrant for drugs in their home. *Id.* at 754, 764. We determined that $821 in cash found in the defendant's purse was the product of an unconstitutional search and seizure, and that her motion to suppress this evidence was erroneously denied. *Id.* at 765. At trial, the defendant had testified, admitting that she possessed the $821 in cash but for innocuous purposes. *Id.* at 757. Despite the defendant's concession, we determined that the erroneous seizure and admission of the cash was not harmless beyond a reasonable doubt, *id.* at 765-767, reasoning that "a defendant's testimony explaining illegally admitted evidence should be considered tainted," and that it would be "virtually impossible to say, on this record,

this conclusion. The "premise of the defense" was to concede on the issue of the composition of the substances and to defend on the issue of intent to distribute. This strategy was introduced by counsel for Ronald during his opening statement and was followed by both defendants. Second, "the frequency of the reference" to the certificates was slight. Aside from their introduction, the certificates were not referred to at trial, and the prosecutor made no reference to them in closing argument. Further, the certificates were "cumulative of properly admitted evidence," namely, the defendants' testimony. While the evidence was certainly of "importance," in the sense that a conviction could not be sustained without proof that the substances were marijuana and cocaine, it played a minor role in the actual conduct of the trial.

whether [the defendant] would have testified had the evidence been suppressed." *Id.* at 766.

The exception articulated in the *Charros* decision, viewing the defendant's testimony as tainted by the error and thus excluded from the determination of harmlessness, has been narrowly construed. It ordinarily applies only when the Commonwealth's evidence was obtained through the government's illegal activity, as in *Charros* and the cases on which it relies, thus implicating a prophylactic principle not applicable in this case. *Commonwealth* v. *Beauchamp*, 49 Mass. App. Ct. 591, 598 n.12 (2000), and cases cited.[7] Even in such cases, the exception would be applicable only where the defendant's testimony was prompted by and offered in response to the content of the improperly admitted evidence. See *Harrison* v. *United States*, 392 U.S. 219, 223 (1968) (defendant testified to "overcome the impact of confessions illegally obtained and hence improperly introduced"); *Fahy* v. *Connecticut*, 375 U.S. 85, 91 (1963) (prejudicial effect of wrongful seizure of paintbrush and paint can included defendants' confessions to hate crime and testimony at trial to explain same). See also 6 W.R. LaFave, Search and Seizure § 11.7(f), at 483 n.275 (4th ed. 2004) ("if it were clear that defendant's testimony about the [illegally seized] evidence was in no sense prompted by its admission, then a harmless error ruling might be justified"). Cf. *Commonwealth* v. *Beauchamp, supra* (defendant's testimony at first trial not tainted by error during that trial, where he vigorously maintained same version of events from onset of police investigation through time of his testimony).

Here, neither the marijuana nor the cocaine was illegally seized, and the drug certificates were plainly admissible had

---

[7]But see *Commonwealth* v. *Allen*, 377 Mass. 674, 677 (1979), applying our holding in *Commonwealth* v. *Vitello*, 376 Mass. 426, 451-457 (1978), and granting a new trial where the unfavorable result of a polygraph test taken by the defendant was admitted by the Commonwealth as evidence of the defendant's guilt. In concluding that it could not say that the error was harmless beyond a reasonable doubt, the court noted that the defendant "might have chosen not to testify" (that his brother had killed the victim in an argument) but for the unfavorable results of the improperly admitted test, which "made it advisable" that he do so. The court also concluded that in any event, the evidence against the defendant (absent the polygraph) "was not overwhelming" and therefore the error was not harmless.

they been offered in evidence through the testimony of the analyst rather than the detective. Moreover, the defendants' testimony was not offered to rebut or explain the contents of the improperly admitted certificates — the accuracy of which was never contested — but rather to rebut the extensive evidence of distribution. This evidence included the packaging and amount of the drugs, the plastic bag with a corner cut off, cash, notebooks, the telephone calls from individuals requesting to purchase drugs, and the expert testimony of Detective Sergeant Montana. Regardless whether the analysts who prepared the drug certificates had been subject to cross-examination, the defendants would still have had to rebut the strong evidence of distribution.

In these circumstances, there is no prophylactic reason or other concern that would cause us to expand the limited exception to our harmless error rule. Accordingly, we consider the defendants' testimony along with the "totality of the record," in determining that the admission of the drug certificates was harmless beyond a reasonable doubt.

3. *Sufficiency of the search warrant application.* Ronald contends that the search warrant application was insufficient to support the magistrate's probable cause determination. Under art. 14 of the Massachusetts Declaration of Rights and the Fourth Amendment to the United States Constitution, a magistrate must "determine that probable cause exists before issuing a search warrant." *Commonwealth* v. *Byfield*, 413 Mass. 426, 428 (1992). We confine our examination of the sufficiency of a search warrant application to the "four corners of the affidavit." *Commonwealth* v. *O'Day*, 440 Mass. 296, 297 (2003), quoting *Commonwealth* v. *Villella*, 39 Mass. App. Ct. 426, 428 (1995).

In this case, the affidavit provided information supplied by two confidential informants, referred to as "CSA" and "CSB." When a supporting affidavit relies on information gleaned from confidential informants, we apply the two-prong *Aguilar-Spinelli* standard.[8] See *Spinelli* v. *United States*, 393 U.S. 410, 415 (1969); *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964). In examin-

---

[8]The *Aguilar-Spinelli* standard requires that the magistrate "be informed of (1) some of the underlying circumstances from which the informant concluded that the contraband was where he claimed it was (the basis of knowledge test), and (2) some of the underlying circumstances from which the affiant

ing the basis of knowledge prong, we note that CSA offered a vivid account of the defendants' drug distribution operation, including the specific location of marijuana and cocaine within the residence, packaging and distribution methods, and the numbers of two cellular telephones used to facilitate drug transactions. CSA's information was independently corroborated by CSB, who described purchasing cocaine from the defendants on at least ten occasions by following the same procedure outlined by CSA: calling one of the two cellular telephone numbers, placing an order, and then meeting one of the defendants at a designated public location near the defendants' residence. The level of detail found in both informants' descriptions is consistent with the kind of firsthand knowledge through personal observation that has repeatedly been held to satisfy the basis of knowledge prong. See, e.g., *Commonwealth* v. *Mubdi*, 456 Mass. 385, 396 (2010); *Commonwealth* v. *Alfonso A.*, 438 Mass. 372, 374 (2003).

The informants' credibility, bolstered by police knowledge of each defendant's identity and residence, was also adequately demonstrated in the affidavit. See *Commonwealth* v. *Welch*, 420 Mass. 646, 651 (1995). As the defendants concede, CSB's reliability was established through previous instances where CSB's information led to the confiscation of illegal narcotics. See *Commonwealth* v. *Perez-Baez*, 410 Mass. 43, 45-46 (1991). With respect to CSA, "the motion judge relied on the extent of detail in the informant's information, police corroboration of a portion of that detail, and police knowledge of the identity and whereabouts of the informant." *Commonwealth* v. *Alfonso A.*, *supra* at 375. CSA's information was also corroborated by CSB's two "controlled buys" of cocaine from the defendants within one week of the filing of the search warrant application. See *Commonwealth* v. *O'Day*, *supra* at 301-302 (description of "controlled buys" in affidavit corroborated informant's description of drug business). See also *Spinelli* v. *United States*, *supra* at 415 (corroborative information in the affidavit may compen-

concluded that the informant was 'credible' or his information 'reliable' (the veracity test)." *Commonwealth* v. *Upton*, 394 Mass. 363, 375 (1985), quoting *Aguilar* v. *Texas*, 378 U.S. 108, 114 (1964). See *Spinelli* v. *United States*, 393 U.S. 410, 415 (1969).

sate for deficiencies in either prong). Looking at the affidavit as a whole, "those factors provided sufficient reason to treat the informant's information as reliable." *Commonwealth* v. *Alfonso A., supra* at 375.

Having determined that the affidavit satisfied the *Aguilar-Spinelli* standard, we now turn to Ronald's contention that the affidavit failed to establish the requisite nexus between the crime and the defendants' residence. In order for an affidavit to support a finding of probable cause, it "must provide a substantial basis for concluding that evidence connected to the crime will be found on the specified premises." *Commonwealth* v. *Donahue,* 430 Mass. 710, 712 (2000). We recently elaborated on this nexus requirement in *Commonwealth* v. *Escalera,* 462 Mass. 636, 643 (2012), in which we concluded that "[o]bservations by police of a suspect on multiple occasions leaving his residence and proceeding directly to a prearranged location to sell drugs can support a reasonable inference that the suspect is a drug dealer who stores drugs or packages drugs for resale in his residence."

The affidavit in this case informed the magistrate that the police separately observed each defendant leaving the shared residence and traveling directly to a prearranged location to sell cocaine to CSB. These observations, when considered along with CSA's detailed description of the drug distribution enterprise operating from the defendants' residence and CSB's corroborating information regarding defendants' modus operandi of delivering the drugs to prearranged locations near that residence, readily establish that this is not a case where the magistrate's probable cause determination was simply inferred from "the fact that the defendant lives there." Contrast *Commonwealth* v. *Pina,* 453 Mass. 438, 441 (2009). The two "controlled buys" and the particularized information of two credible informants provided the magistrate with a substantial basis for finding probable cause to believe that a search of the defendants' residence would uncover evidence of illegal drug distribution. See *Commonwealth* v. *Escalera, supra* at 644. The search warrant was constitutionally valid.

4. *Telephone calls to request drugs.* During the execution of the search warrant, Detective Hyde recovered two cellular tele-

phones from the defendants' bedrooms. Soon after he took pos-
session of these telephones, they began to ring, and he answered
and asked what each caller wanted. At least two of the callers
requested to purchase drugs. Prior to trial, the Commonwealth
filed a motion to admit the statements made to Detective Hyde
during these telephone calls. The motion judge, who was also
the trial judge, ruled that the statements were admissible for the
nonhearsay purpose of showing "the fact that that statement
was made," which was "relevant to the determination whether
there was intent" to distribute the drugs that the defendants'
admittedly possessed.

At trial, Detective Hyde testified that he received approxi-
mately ten to twelve telephone calls during the execution of the
search warrant. One caller identified himself as "Ed" and asked
for "Ray or Ron." When Detective Hyde asked what the caller
needed, "the individual requested to purchase $100 worth of
cocaine." Detective Hyde directed the caller to a designated
location, and soon thereafter "Ed" telephoned to announce his
arrival. Detective Hyde then arranged for police officers to stop
and identify the person at the designated location. "Ed" then
telephoned a third time, telling Detective Hyde not to meet him
because "the police [were] there."

Detective Hyde also described another telephone call he
received, where again, the caller asked for "Ray or Ron." The
caller requested to purchase cocaine for herself and marijuana
for her niece. Detective Hyde directed the caller to another
prearranged location and asked for officers to meet her at the
location, stop her, and identify her. Detective Hyde then received
a follow-up telephone call from this person — whom he
recognized by voice and the telephone number — asking him to
meet her somewhere else because she had just been stopped by
the police.

Raymond claims error in the admission of Detective Hyde's
testimony regarding these telephone calls, which he portrays as
hearsay and violative of the confrontation clause.[9] We disagree.
The rule against hearsay bars admission of out-of-court state-

---

[9]Raymond also contends that Detective Hyde's "interception" of the calls
to the defendants' telephones violated the Massachusetts Wiretap Statute,
G. L. c. 272, § 99 C 1. This argument is meritless. The statute clearly applies

ments offered for their truth. Mass. G. Evid. §§ 801-802 (2012). Although the callers' statements were made out of court, the Commonwealth did not offer them for their truth.[10]

The focus of the trial was on whether the defendants intended to distribute cocaine and marijuana. Repeated calls to a particular telephone number requesting to purchase drugs increase the likelihood that the telephone is being used to facilitate drug sales. See *Commonwealth* v. *DePina*, 75 Mass. App. Ct. 842, 850 (2009) (officer's conversation with person calling defendant's telephone looking to buy drugs admissible as evidence that telephone was instrumentality of drug distribution). See also *Commonwealth* v. *Massod*, 350 Mass. 745, 747-748 (1966), quoting *Commonwealth* v. *Jensky*, 318 Mass. 350, 352 (1945) (telephone conversations admissible as evidence that telephone was " 'apparatus' . . . for registering bets"). Possession of an instrumentality of the drug trade is evidence of intent to distribute drugs. See *Commonwealth* v. *Gollman*, 436 Mass. 111, 116 (2002). In this respect, as the motion judge correctly noted, the statements were admissible simply because they were made during calls to the defendants' telephones.

Because the statements were admitted for a nonhearsay purpose, Raymond's confrontation clause argument necessarily fails as well. See *Crawford* v. *Washington*, 541 U.S. 36, 59 n.9 (2004) (confrontation clause protections not triggered by statements used "for purposes other than establishing the truth of the matter asserted"); *Commonwealth* v. *Pytou Heang*, 458 Mass. 827, 854 (2011). Raymond points out that the admissibility of an extrajudicial statement under a hearsay exception is not determinative as to a defendant's confrontation rights. Although this argument is correct, see *Commonwealth* v. *Gonsalves*, 445 Mass. 1, 14 (2005), cert. denied, 548 U.S. 926

to clandestine tactics employing "intercepting device[s]." *Id.* at § 99 B 3. No such device was present here, nor did Detective Hyde "secretly hear" communications when he simply answered ringing telephones and conversed with the callers. *Id.* at § 99 B 4. See *Commonwealth* v. *Todisco*, 363 Mass. 445, 452 (1973) (legislative intent was clearly to proscribe "illegal use of devices external and extraneous to the regular telephone equipment").

[10]We decline Raymond's invitation to rule that all drug request calls are implied assertions inadmissible under the rule against hearsay. Express or implied, an assertion not offered for its truth is not hearsay. See, e.g., *Commonwealth* v. *Beaz*, 69 Mass. App. Ct. 500, 502 (2007).

(2006), it is inapplicable where the statements at issue are offered for a nonhearsay purpose, rather than through a hearsay exception. See *Crawford* v. *Washington, supra.* This distinction is critical, as statements admitted as exceptions to the hearsay rule may be admitted for their truth, thereby implicating confrontation clause concerns. See *Commonwealth* v. *Gonsalves, supra* (noting that out-of-court statement admissible as spontaneous utterance may nonetheless be testimonial). See generally Mass. G. Evid., *supra* at §§ 801-806. There was no error.

Where extrajudicial statements such as these are admitted for reasons other than their truth, "a party is entitled to ask for and obtain a limiting instruction." *Commonwealth* v. *Purdy,* 459 Mass. 442, 453 (2011). Because the defendants in this case did not request such an instruction, "we review for a substantial risk of a miscarriage of justice." *Commonwealth* v. *Washington,* 449 Mass. 476, 488 (2007). No such risk was present here. Given the totality of the evidence with respect to the defendants' drug distribution enterprise, we find it unlikely that the lack of an instruction influenced the jury on this point. See *id.* at 489. See also *Commonwealth* v. *Cartagena,* 32 Mass. App. Ct. 141, 145-146 (1992).[11]

5. *Conclusion.* For the foregoing reasons, the defendants' convictions are affirmed.

*So ordered.*

---

[11]With respect to the calls made to the defendants' telephones after the callers had encountered the police, the jury could not reasonably have considered them for their truth in any event. The callers stated nothing relevant to the defendants' guilt that could be considered for its truth, that is, that the caller was actually on the street and the police were present. What is relevant was not that these things had actually happened, but that the callers thought the defendants should know about them.